Commonwealth *v.* Heller, Appellant.

Argued January 15, 1952. Before DREW, C. J., STERN, STEARNE, BELL, CHIDSEY and MUSMANNO, JJ.

*Benjamin R. Donolow,* for appellant.

*Richardson Dilworth,* District Attorney, with him *Armand Della Porta* and *Michael von Moschzisker,* Assistant District Attorneys, for appellee.

Opinion by Mr. Justice Horace Stern, March 24, 1952:

Defendant killed his wife and the jury found him guilty of murder of the first degree with penalty of life imprisonment. He appeals from his conviction.

The parties had been married for ten years and the wife was thirty years of age. At the trial defendant testified that she was a hypochondriac, extremely nervous, and continually expressing the fear that she would die in her sleep; the result was that she prevented his obtaining adequate rest and peace of mind. At six o'clock on the morning of May 18, 1950, leaving his wife still sleeping, he arose, dressed, went downstairs, drank a cup of coffee, and glanced over the morning newspaper. He then went upstairs again after arming himself with a heavy galvanized iron pipe which he had procured in the kitchen, and, standing by her bedside, he bludgeoned the head of his sleeping wife with such force as to crush her skull in two places, causing a hemorrhage of the brain and her immediate death. He felt her pulse and, finding it lifeless, he placed the pipe on the bed, covered his wife's body with the blankets, washed the blood from his arms and hands, removed his shirt and rolled it up together with his washrag and the pillow case on which he had slept, all of which were stained with blood, and placed them in the bathroom; he awakened his children, two boys aged respectively five and eight, helped them dress, took them to the house of his brother, went to some taprooms and procured drinks of whiskey, and then proceeded to a police station where he told the captain that he had just killed his wife. When asked by one of the detectives as to his reason for committing the crime he said that "maybe" it was something that occurred five or six or seven years ago, but ventured no further explanation. That afternoon he gave the

police a written and signed statement in which he detailed all that had occurred immediately prior to and following the killing, but claimed that he had no consciousness of what he was doing from the time he went up to the bedroom until he saw the blood and realized that his wife was dead.

The defense was that of insanity, but there was not a shred of testimony offered to support it other than the defendant's own assertion that he did not know at the time he killed his wife what he was doing,—that his mind then went blank. There is no evidence in the record of any mental pathology of the defendant prior to the murder. He was employed by the Atlantic Refining Company and had never missed a day there from work. He says that he had occasional headaches, but admits that he never consulted a physician in regard to them. He produced several witnesses—relatives, friends, fellow workmen—none of whom testified to having noticed anything of importance that was abnormal in either his speech or his conduct; the most that those who worked with him said was that he sometimes seemed to be tired in the mornings, as though he had not slept well the night before. A psychiatrist, who testified on his behalf and who had examined him on November 1, six months after the murder, said that he found him in a state of "extreme depression and marked anxiety,"—a far cry from a diagnosis of insanity as of that time. He expressed the belief that defendant "became acutely mentally ill," that he was "in marked depression" at the time he killed his wife, basing this impression on what defendant had told him and "what he learned from others."[1] However,

---

[1] As to an expert opinion being based in whole or in part on facts learned from others but not disclosed to the jury see: *Howarth v. Adams Express Co.*, 269 Pa. 280, 283, 112 A. 536, 538; *McMinis v. Philadelphia Rapid Transit Co.*, 288 Pa. 377, 382, 383, 135 A.

when asked directly: "Did he know the difference between right and wrong on November 1?" the witness answered: "I don't know." When asked: "Did.he know the difference between right and wrong on May 18?" his reply was: "I don't know." When asked: "Did he know the nature and quality of his acts on May 18?" his reply was: "I don't know if he did or not." The most that this expert finally ventured to say on defendant's behalf was: "I think he was in such disturbed state of mind that he was not entirely non compos mentis but certainly he didn't know what he was doing." Asked, finally, whether he had "cause to doubt whether defendant knew the difference between right and wrong on May 18th, 1950", he replied: "From what I gathered, I wouldn't think that he would when he had no sleep and had all this piled on his head." All this testimony, viewed as an entirety, falls considerably short of an unambiguous opinion that at the time of the homicide defendant did not understand the nature and quality of his act or the difference between right and wrong, which is the legal test for a finding of insanity that would excuse the perpetrator of a homicide from criminal responsibility.

One of defendant's complaints on appeal is that the trial judge, in referring to the testimony of this psychiatrist, charged the jury that "An opinion is only an opinion. It creates no fact. . . . Because of this, opinion evidence is considered of a low grade and not entitled to much weight against positive testimony of actual facts." This characterization of opinion evidence was stated in exactly those same words in *Ray v. Phil-*

722, 724; *Pietro v. Philadelphia Rapid Transit Co.*, 298 Pa. 423, 428, 429, 148 A. 520, 521, 522; *Roberts v. Pitt Publishing Co.*, 330 Pa. 44, 51, 52, 198 A. 668, 671, 672; *Bowles v. Pittsburgh*, 343 Pa. 39, 46, 47, 20 A. 2d 783, 786; *Johnson v. Valvoline Oil Co.*, 131 Pa. Superior Ct. 266, 270, 271, 200 A. 224, 226; 175 A. L. R. 287, 288.

*adelphia,* 344 Pa. 439, 441, 25 A. 2d 145, 146; they were approved in *Pochron Will,* 367 Pa. 306, 311, 80 A. 2d 794, 796, 797, as having been "well expressed", and were repeated in *McCormick Transportation Co. v. Philadelphia Transportation Co.,* 161 Pa. Superior Ct. 533, 538, 539, 55 A. 2d 771, 774; see also *Wood Appeal,* 167 Pa. Superior Ct. 92, 100, 74 A. 2d 538, 542.[2] If, therefore, it be true, as obviously it is, that "Opinion evidence is not entitled to much weight against *positive testimony of actual facts,"* defendant's actions in the present case, speaking louder than his words, wholly refute the opinion evidence of the expert medical witness, vague and inadequate as it was to establish what the law regards as exculpatory insanity. Everything that defendant did both immediately before and immediately after he killed his wife shows that he was in perfect possession of his senses, and the jury was well justified in not accepting his own statement that just for the few minutes required in which to perpetrate the killing he was mentally irresponsible and had no consciousness of what he was doing. Moreover, as already pointed out, he admitted that there might have been a reason for murdering his wife. His father-in-law testified that defendant told him that the reason occurred 7½ years before, although to him also, as to the detective, he did not state what the reason was. But the evidence indicates either of two possible motivations or perhaps a combination of both. The one was in regard to his impatience with his wife's nervousness and premonitions of death during her sleep; the other

---

[2] Notwithstanding the trial judge's depreciation of the value of opinion evidence as compared with factual testimony he instructed the jury that *all* the evidence offered in the case was important and should be considered by them in arriving at their verdict, that it was their province and their province alone to consider the evidence, and that they were not bound by anything that he had said in reviewing it.

is suggested by the question addressed to him in cross-examination. "Weren't you conducting an illicit romance with another woman?" He denied this and was then asked, "Did you ever suggest to another woman that she divorce her husband and if she did you would know what to do?" This too he denied. The Commonwealth, however, called as a witness his sister-in-law, who testified that defendant told her some years before that he was in love with her, that they had long been indulging in sexual intercourse in his home, and that he had asked her whether she would divorce her husband whereupon he would leave his wife, but she refused. Such testimony as to likely motive bore strongly on the question as to whether he intended to kill his wife or had acted without any mental consciousness whatever. Defendant contends that the Commonwealth had no right to question him on this subject because the interrogation suggested the commission by him of another crime, namely, adultery,[3] and was, therefore, in violation of the Act of March 15, 1911, P. L. 20. This indicates, however, a misapprehension as to the scope and purpose of that act, which was intended merely to prevent blackening a defendant's reputation or attempting to prove a disposition to commit crime, but if there is another legitimate purpose, as, for example in the present case, to show motive, the Act of 1911 does not prohibit the Commonwealth from such interrogation and from contradicting the defendant's denial by rebuttal testimony; see *Commonwealth v. Cicere*, 282 Pa. 492, 496, 497, 128 A. 446, 448; *Commonwealth v. Dorst*, 285 Pa. 232, 235-238, 132 A. 168,

---

[3] Evidence of the commission of another offense is always relevant to establish identity, that the act was intentional, to prove motive, and for many other purposes: *Goersen v. Commonwealth*, 99 Pa. 388, 398, 399; *Commonwealth v. Williams*, 307 Pa. 134, 148, 160 A. 602, 607.

169, 170; *Commonwealth v. Robinson,* 163 Pa. Superior Ct. 16, 23, 60 A. 2d 824, 827.

The trial judge charged the jury that "The law of Pennsylvania also is that the fatal use of a deadly weapon upon a vital part of another's body, when established as a fact, warrants an inference that the act was done with specific intent to take the life and would justify a verdict of guilty of murder of the first degree." This was substantially the language apparently approved in *Commonwealth v. Pasco,* 332 Pa. 439, 447, 2 A. 736, 739; *Commonwealth v. Kelly,* 333 Pa. 280, 289, 4 A. 2d 805, 809; *Commonwealth v. Samuel Jones,* 355 Pa. 522, 526, 50 A. 2d 317, 319; and *Commonwealth v. Holley,* 358 Pa. 296, 301, 302, 56 A. 2d 546, 549; see also *Commonwealth v. Weston,* 297 Pa. 382, 388, 147 A. 79, 81; *Commonwealth v. Chapman,* 359 Pa. 164, 167, 58 A. 2d 433, 434; *Commonwealth v. Steele,* 362 Pa. 427, 430, 66 A. 2d 825, 827. It is true that it omitted the qualifying phrase "with a manifest intention to use it upon him" which appears in *Commonwealth v. Drum,* 58 Pa. 9, 17, and of course it is also true that unless the accused *intends* to use the deadly weapon upon a vital part of the victim's body,—if, in other words, the application of the weapon to such vital part is only by way of accident and without design,—the factual presumption that the act was done with specific intent to take the life does not arise. While, therefore, it might in some such case be necessary to employ such a qualification, it would, in the present case, be a merely academic requirement since defendant not only aimed the weapon at his wife's head but struck repeatedly and with brutal force.

Other assignments of error argued by defendant are not of sufficient importance to merit discussion.

Judgment and sentence affirmed.