Commonwealth *v.* Coyle, Appellant.

380

Argued January 22, 1964. Before Bell, C. J., Mus-
manno, Jones, Cohen, Eagen, O'Brien and Roberts,
JJ.

*Mary Alice Duffy,* for appellant.

*William H. Wolf, Jr.,* Assistant District Attorney, with him *Arlen Specter,* Assistant District Attorney, *William D. Harris,* Chief Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 14, 1964:

The appellant-defendant, John J. Coyle, was convicted by a jury in the court below of first degree murder. Punishment was fixed at death. Motions in arrest of judgment and for a new trial were denied. Following imposition of sentence in accordance with the jury's verdict, the issue was brought to this Court by an appeal from the judgment.

A brief summary of the facts incident to the killing involved and the events leading to its occurrence as established by the evidence is as follows:

On December 26, 1958, John Coyle and his brother, William Coyle, committed an armed robbery of a store in Buzzard's Bay, Massachusetts. Shortly thereafter,

fearing detection and arrest, they decided to leave Buzzard's Bay where they had been residing, traveled to Bangor, Maine, and eventually to Philadelphia, Pennsylvania, to hide out.

On January 29, 1959, they rented a furnished apartment at 1539 Erie Avenue, Philadelphia, under fictitious names. Although they had relatives and close friends in the city, they continuously concealed their real identity and refrained from contact with persons who knew them.

On April 3, 1959, being in need of money, they decided to rob again. At ten o'clock that morning, they took at gun point an automobile and its owner (one Ralph Gallagher) from the parking lot of La Salle College, Philadelphia. Gallagher was later forced into the trunk of the automobile where he remained imprisoned for several hours. The Coyles then drove around the city to find "an easy job to rob." About eight-thirty o'clock that evening, they committed an armed robbery of a Philadelphia taproom known as the Wistar Tavern. They fled the scene in the Gallagher automobile, later abandoning it in another section of the city, with the owner left in the locked trunk. They then returned to their apartment.

Following this episode, their fear of apprehension increased and they both armed themselves with concealed, loaded revolvers every time they ventured forth from the apartment.

In the month of May, 1959, their money ran out again. They began sneaking out of the apartment in the early morning hours and stealing milk from porches of residences nearby. The method of operation was for one of the brothers to approach the residence to get the milk while the other would stand armed nearby to "cover him." If anyone tried to apprehend them, it was agreed that they would shoot their way out if necessary.

Before dawn on the day in question, June 5, 1959, they both armed themselves with revolvers and again went out in the neighborhood seeking food. At a nearby residence on Sydenham Street, William was engaged in stealing milk from the front porch when James Kane, a uniformed officer of the Philadelphia Police Department, who was patrolling a beat in the area, came down the street and caught him in the act.[1] John, armed, was out in the street nearby The police officer pulled his gun and yelled to William: "What are you doing there? Halt or I'll shoot." Someone else then said, "I'll kill you." Before the officer fired a shot, one of the two Coyle brothers fired five shots from a .38 caliber revolver, three of which entered Kane's body killing him instantly.

## Motion in Arrest of Judgment

One eyewitness to the occurrence definitely identified John Coyle as the actual killer. This evidence, in itself, is sufficient to sustain the verdict. See, *Commonwealth v. Gooslin,* 410 Pa. 285, 189 A. 2d 157 (1963); *Commonwealth v. Kirkland,* 413 Pa. 48, 195 A. 2d 338 (1963).

Other testimony indicates that William Coyle fired the fatal shots.[2] However, if this is correct, the evidence was also sufficient to establish that John Coyle was present on the scene aiding and abetting his

---

[1] The people in the neighborhood had previously complained of the milk thefts and the police on these beats had been alerted to watch out for the thief, whose identity was unknown.

[2] It was still dark when the shooting occurred. Several residents in the neighborhood, upon hearing the commotion in the street, looked from windows in their homes to see what was happening. They were witnesses at trial and their description of the event varied in some details. Additionally, pretrial statements of the appellant, while admitting being on the scene, alleged William fired the shots.

brother in the commission of the crimes. Under these facts, both were equally guilty and John, as a principal in the second degree, would be subject to the same punishment as if he were the principal felon. See Act of June 24, 1939, P. L. 872, §1105, as amended, 18 P.S. §5105; Perkins, Parties to Crime, 89 U. of P. Law Review 581 (1941); Herz, Principals and Accessories to Crime under Pennsylvania Law, 30 Temple Law Quarterly 180 (1957); 1 Wharton's Criminal Law and Procedure, Parties, §115 (1957); *Commonwealth v. Klose*, 4 Kulp 111 (1886); *Commonwealth v. Strantz*, 328 Pa. 33, 195 A. 75 (1937); *Commonwealth v. Parmer*, 364 Pa. 11, 70 A. 2d 296 (1950).

The motion in arrest of judgment was, therefore, properly overruled.

### Motion For a New Trial

One of the many assignments of error alleges that the evidence was insufficient to warrant a finding that John Coyle "aided and abetted" his brother, William (assuming the latter was the actual killer), in the murder of Officer Kane, and that the trial court, therefore, erred in submitting this question to the jury. With this, we do not agree.

If the jury concluded that William fired the fatal shots, the evidence was also sufficient to warrant the jury in finding that John Coyle was present nearby as a "lookout"; that he was armed with a deadly weapon; that in accordance with a previous agreement with his brother, he was prepared and ready to shoot and kill any person who tried to apprehend either one. Thus, he was present aiding, encouraging and sustaining his brother, not only in the stealing of the milk but in any effort necessary to prevent arrest. It, therefore, was a concerted action. This constitutes "aiding and abetting." See, *Common-*

*wealth v. Klose,* supra; *Commonwealth v. Ford,* 86 Pa. Superior Ct. 483 (1925); *Weston v. Commonwealth,* 111 Pa. 251, 2 A. 191 (1886); *Commonwealth v. Mendola,* 294 Pa. 353, 144 A. 292 (1928); *Commonwealth v. Strantz,* supra; *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733 (1953).

As stated in *Lowry* at pages 600-601, quoting from *Weston v. Commonwealth,* supra, at 263: " 'It is not necessary, however, to prove that the party actually aided in the commission of the offence; if he watched for his companions, in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law, he was aiding and abetting.' "

Another assignment of error complains that it was prejudicial error to admit in evidence at trial proof that John and William Coyle committed other crimes prior to the date of the Kane killing.

In oral statements and written confessions made to the investigating officers following his arrest, the appellant described the commission of these crimes including the Buzzard's Bay robbery, the stealing of the Gallagher automobile, the abduction of its owner, the Wistar Tavern robbery and the practice of carrying concealed weapons. He also recited their fear of arrest for this criminal activity and their plans to avoid arrest.

With the exception of the Wistar robbery, the evidence of which was admitted for the purpose of motive as well as an aid to the jury in fixing the penalty in the event of a first degree murder verdict, the appellant's admissions and description of the commission of these prior crimes were admitted at trial solely for penalty purposes. The jury was instructed in clear

language on several occasions that this evidence was not to be considered in resolving the question of guilt.[3]

The trial was conducted and concluded prior to the effective date of the Split-Verdict Act of December 1, 1959, P. L. 1621, 18 P.S. §4701. Under the rules of procedure, then in existence for determining penalty in such cases, it was not error to admit this evidence for penalty purposes: *Commonwealth v. Dague,* 302 Pa. 13, 152 A. 839 (1930); *Commonwealth v. Thompson,* 389 Pa. 382, 133 A. 2d 207 (1957); *Commonwealth v. Rucker,* 403 Pa. 262, 168 A. 2d 732 (1961); *United States v. Myers,* 311 F. 2d 311 (1962), cert. den. 347 U. S. 844 (1963).

The Split-Verdict Act was not retroactive: *Commonwealth v. Scoleri,* 399 Pa. 110, 160 A. 2d 215 (1960). Nor has it application in the present case, even though the judgment of sentence was entered after the legislation went into effect. See, *Commonwealth v. Rucker,* supra, which presents a similar situation. The Split-Verdict Act merely changed the method or procedure to be employed in fixing the penalty in *subsequent* relevant trials: *Commonwealth v. McCoy,* 405 Pa. 23, 172 A. 2d 795 (1961). It did not invalidate prior trials conducted in accordance with procedural rules then proper and valid.

Nor is there merit to the contention that appellant's pretrial admissions of these prior crimes were inadmissible because he had not been previously convicted and sentenced thereon. A statement or confession of an accused admitting the actual commission of other crimes, if relevant, is admissible even though no prior convictions had been effected. See, *Commonwealth v. Jones,* 355 Pa. 594, 50 A. 2d 342 (1947);

---

[3] This instruction was more favorable to the defendant than he was entitled to since the evidence was also proper to establish guilt as we shall subsequently point out.

*Commonwealth v. Simmons,* 361 Pa. 391, 65 A. 2d 353 (1949) ; and, *Commonwealth v. Rucker,* supra.

Evidence of appellant's prior crimes was also admissible in the present case for purposes other than penalty.

It is patently clear from the record and particularly appellant's own admissions, that these prior crimes were all interwoven and directly connected with the Kane killing. In fact, the killing grew out of this whole scheme of prior criminal activity. The Coyles did not kill Kane to avoid an arrest for larceny of milk. They did not arm themselves that morning and shoot their way out merely to avoid apprehension for milk stealing. They shot and killed to prevent apprehension which they feared and knew would identify and connect them with the armed robberies and other associated crimes they had just previously committed. The evidence was, therefore, admissible to establish the malice of, the intent and motive for, this otherwise unexplainable vicious and cold-blooded killing.

As early as the year 1863, this Court recognized the probative value of such evidence. In *Commonwealth v. Ferrigan,* 44 Pa. 386 (1863), at 387 and 388, Justice THOMPSON speaking for a unanimous court pointedly stated: "The rule on this subject may in substance be stated to be that, where facts and circumstances amount to proof of another crime than that charged, and there is ground to believe that the *crime charged grew out of it, or was in any way caused by it,* such facts and circumstances may be proved to show the quo animo of the accused. . . .

"In all . . . cases of wilful, deliberate, and premeditated killing, the *intent* becomes important, and if this can be collected from the acts or deliberations of the prisoner, it is evidence. This was the object of the testimony in this case, and it was not evidence, nor admitted for any other purpose. *There are many*

*instances in the books of killing, to conceal prior crimes.* Indeed, it would be difficult to detect criminals, and bring them to punishment, by any other means than by *following the thread of impelling motives.* Whatever may throw light on this, on trials of criminal acts, is proper for the jury. . . .

"When, therefore, the quo animo is so important an element as it is in murder under our statute, by other means than there specially enumerated [i.e., other than felony murder] *the motive is important, and may be traced to or through other and distinct crimes."* (Emphasis supplied).

Again in *Commonwealth v. Chiemilewski,* 243 Pa. 171, 89 A. 964 (1914), at 179, citing from 12 Cyc. 410, at 410, we stated: " 'Thus it may be shown that the crime charged was committed for the purpose of concealing another crime, or to prevent the accused from being convicted of another crime.' "

Again, we said in *Commonwealth v. Wable,* 382 Pa. 80, 114 A. 2d 334 (1955), at 84, speaking through Mr. Chief Justice STERN: "[S]ometimes there exist the 'special circumstances' which operate as exceptions to the general rule, and bring the case within the equally well established principle that evidence of other crimes *is* admissible when it tends to prove a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial,—in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. A veritable multitude of authorities in our appellate courts enunciate, albeit in varying language this familiar principle."

That this is and has always been the law in Pennsylvania is beyond argument. See, *Commonwealth v. Morrison,* 266 Pa. 223, 109 A. 878 (1920); *Commonwealth v. Luccitti,* 295 Pa. 190, 145 A. 85 (1928); *Commonwealth v. Edwards,* 318 Pa. 1, 178 A. 20 (1935); *Commonwealth v. Heller,* 369 Pa. 457, 87 A. 2d 287 (1952); *Commonwealth v. Kravitz,* 400 Pa. 198, 161 A. 2d 861 (1960); *Commonwealth v. Gockley,* 411 Pa. 437, 192 A. 2d 693 (1963); *Commonwealth v. Raymond,* 412 Pa. 194, 194 A. 2d 150 (1963), cert. den. 377 U. S. 999 (1964).

The evidence of the commission of these other related crimes was, under the circumstances presented, also relevant and admissible to establish the intimacy, confederacy and concerted actions of the brothers, an important factor in the present case. *Hester v. Commonwealth,* 85 Pa. 139 (1878); *Commonwealth v. Biddle (No. 2),* 200 Pa. 647, 50 A. 264 (1901); *Commonwealth v. Robb,* 284 Pa. 99, 130 A. 302 (1925).

Nor was the competency of the evidence concerning the Buzzard's Bay robbery, which occurred approximately five and one-half months before the murder in issue, impaired by the lapse of time since the relationship between the two occurrences was clear. *Commonwealth v. Minoff,* 363 Pa. 287, 69 A. 2d 145 (1949).

The next assignment of error concerns the admission of evidence relating to appellant's flight after the killing of Officer Kane and his course of conduct until he was captured and taken into custody.

A brief summary of these facts established by the testimony of eyewitnesses and by admissions of the appellant is as follows:

After the shooting, John and William Coyle ran to their apartment on Erie Avenue, where they remained for a couple of hours. They then decided to leave the area and armed themselves with five revolvers and a

large quantity of ammunition. They then walked to the Roxborough-Manayunk section of Philadelphia and hid in the woods overnight. About twelve o'clock noon of the next day, one William Sedgwick was parking his automobile on the lot of the Container Corporation in Manayunk, a community near Philadelphia, when John and William Coyle appeared on the scene. John approached him with a gun in hand and said, "This is a holdup." William came up from behind and poked a gun in Sedgwick's ribs. The latter was compelled to hand over his wallet containing a sum of money, and then forced into the back seat of the car. The Coyles took control of the vehicle and drove off, eventually arriving back in the State of Massachusetts. Sedgwick was kept as a prisoner hostage and threatened with the loss of his life, if he did not do what he was told. For a good part of the time, the parties hid in the woods to avoid detection.

During the morning of June 15th, Sedgwick was bound with a rope on the back seat of the automobile. The Coyles then drove out of their wooded hiding place and committed an armed robbery of a liquor store in Middleboro, Massachusetts. They then fled the scene and returned to the woods outside of town to hide.

The police were immediately notified of the robbery and within a short time traced the automobile to its hiding place.[4] When they arrived a short distance from where the car was parked, the occupants were ordered to surrender. The Coyles emerged with their hands up and a gun in each hand. When told to drop their guns, they dropped them waist-high and started to shoot at the police. Many shots were exchanged, but none took effect. The Coyles escaped on foot into the woods.

---

[4] The local and state police had previously received bulletins from Philadelphia concerning and describing the Coyle brothers.

That same night about eleven-thirty o'clock, after traveling through the woods for several hours, they came upon a house on the outskirts of Middleboro, which they entered with guns ready. No one was home. The occupants had moved out temporarily the same day. They hid in this house overnight, taking food and clothing found therein. About noon the next day, they returned to the woods to hide.

On Wednesday morning, the following day, they were spotted by nearby residents; the police were notified and arrived within minutes. Again the appellant and his brother refused to surrender and started shooting at the police. In the exchange, William Coyle was fatally shot. John Coyle then gave himself up.

The evidence complained of was correctly admitted.

When a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis in connection with other proof from which guilt may be inferred: *Com. v. Boschino,* 176 Pa. 103, 34 A. 964 (1896); *Commonwealth v. Fasci,* 287 Pa. 1, 134 A. 465 (1926); *Commonwealth v. Del Giorno,* 303 Pa. 509, 154 A. 786 (1931); *Commonwealth v. Homeyer,* 373 Pa. 150, 94 A. 2d 743 (1953).

While the testimony relating to the Coyles' flight included evidence of the commission of other crimes, this did not destroy its admissibility. It was not admitted for the purpose of establishing the Coyle brothers' guilt of these crimes, but rather to show their consciousness of guilt of the Kane killing and the means employed to escape arrest for that particular crime. The robbery of Sedgwick, the stealing of his automobile, the holdup in Middleboro, the resisting of arrest and the gunplay with the police were all means employed to escape arrest for the Kane murder. All of these acts had a clear and definite connection

with the crime involved. The evidence thereof was for the jury's consideration. See, *Commonwealth v. Weiss,* 284 Pa. 105, 130 A. 403 (1925); *Commonwealth v. Scoleri,* supra; *Johnson v. State,* 188 Ga. 771, 4 S.E. 2d 639 (1939); *McClung v. State,* 206 Ga. 421, 57 S.E. 2d 559 (1950); *Killough v. State,* 231 P. 2d 381 (Okla.) (1951); *Cothron v. State,* 138 Md. 101, 113 A. 620 (1921); *Leonard v. State,* 17 Ariz. 293, 151 P. 947 (1915). Compare also, *Commonwealth v. Biddle (No. 2),* supra; and *Commonwealth v. Luccitti,* supra.

The criminal activity of the appellant and his brother during their flight was established at trial by the Commonwealth, not only by proof of the appellant's own admissions, but also by the oral testimony of Sedgwick and other eyewitnesses to the events involved. The admission of the last mentioned proof was not error since the related events had a direct connection with the crime on trial. See, *Commonwealth v. Edwards,* supra; *Commonwealth v. Raymond,* supra; and *Commonwealth v. Wendt,* 258 Pa. 325, 102 A. 27 (1917); *Commonwealth v. Wable,* supra.

It is strongly urged that the proof at trial of the Coyles' other crimes, both before and after the killing of Kane, so beclouded the main issue that it resulted in unfairly influencing the jury's determination of guilt, citing, *U. S. ex rel. Scoleri v. Banmiller,* 310 F. 2d 720 (1962). If the crimes involved were not directly related to the crime and issue on trial, there might be merit to this contention. However, all of these crimes were so closely connected with the Kane killing, either in establishing the motive therefor or the consciousness of guilt and the means employed to escape arrest, that the jury had the right to hear and consider this evidence.

The next assignment of error is interrelated with those discussed previously. It is complained that the district attorney was permitted, in violation of the Act of March 15, 1911, P. L. 20, §1, 19 P.S. §711, to cross-examine the appellant concerning the commission of these other crimes. Again, since these crimes had a direct connection with the crime involved, such cross-examination was proper. See, *Commonwealth v. Heller*, 369 Pa. 457, 87 A. 2d 287 (1952); *Commonwealth v. Nelson*, 396 Pa. 359, 152 A. 2d 913 (1959); *Commonwealth v. Raymond*, supra.

The appellant complains that the district attorney was permitted to argue to the jury that John Coyle attempted to kill William Sedgwick to the serious prejudice of the defendant's right to a fair trial. An examination of the record indicates why this was proper argument.

When the police first confronted the Coyle brothers and discovered the Sedgwick automobile in the woods on the outskirts of Middleboro, Massachusetts, as related hereinbefore, they refused to surrender and succeeded temporarily in shooting their way out. When this shooting began, Sedgwick burrowed himself into the back seat of the car in terror. After traveling a short distance from the car during gunplay, John Coyle doubled his way back to get some money which had been left in the car on the front seat. At that moment, two shots were fired into the car towards Sedgwick from the point where John was standing on the driver's side of the car. Expert ballistic trial testimony showed that the two discharged bullets, later located inside the car, came from a gun found in the possession of William Coyle, when the brothers were finally apprehended. This evidence was, therefore, relevant to indicate an attempt by John Coyle to kill Sedgwick to conceal and destroy a witness to his criminal activity during his effort to escape. The dis-

trict attorney had every right to argue the serious implications of this evidence to the jury.

The appellant next complains that he was not given a preliminary hearing and was indicted in absentia.

A fugitive from justice[5] need not be given a preliminary hearing and may properly be proceeded against by use of a district attorney's bill with the approval and under the supervision of the court. See, *Commonwealth v. O'Brien,* 181 Pa. Superior Ct. 382, 124 A. 2d 666 (1956); *Commonwealth v. Hoffman,* 396 Pa. 491, 152 A. 2d 726 (1959); *Commonwealth ex rel. Blackman v. Banmiller,* 405 Pa. 560, 176 A. 2d 682 (1962).

The appellant next complains that the indictment was based on insufficient competent testimony and should have been quashed. This complaint is without merit. See, *Commonwealth v. Deppen,* 52 Pa. D. & C. 442 (1944); *Commonwealth v. Halleron,* 163 Pa. Superior Ct. 583, 63 A. 2d 140 (1949); *Commonwealth v. Kumitis,* 190 Pa. Superior Ct. 133, 151 A. 2d 653 (1959); and, *Costello v. United States,* 350 U.S. 359, 76 S. Ct. 406 (1956).

The next assignment of error contends that a search and seizure of and in the Coyle apartment at 1539 Erie Avenue, Philadelphia, Pennsylvania, was illegal and in violation of constitutional rights.

The search without a body or search warrant was conducted on June 9, 1959. Since it was not substantially contemporaneous with the arrest (which occurred on June 17, 1959), and confined to the immediate vicinity thereof, it cannot be justified as an incident thereto. See, *Stoner v. State of California,* 84 S. Ct. 889, decided March 23, 1964. However, the

---

[5] The warrant was issued and William and John Coyle were indicted for the Kane murder while they were still fugitives.

search and seizure was not illegal. The entry was made to the apartment with the express consent, approval and assistance of the landlady and owner of the premises after the Coyles had abandoned the apartment without any intention of returning thereto. The Fourth Amendment to the United States Constitution proscribes against unreasonable searches and seizures in peoples' "houses." This constitutional safeguard has reference to a place of occupancy. It does not concern vacated premises or articles abandoned. See, *Feguer v. United States,* 302 F. 2d 214 (1962) ; *Abel v. United States,* 362 U. S. 217, 80 S. Ct. 683 (1960).

The articles seized in the apartment were proper evidence and relevant to the issue on trial. These included a sawed-off shotgun, hundreds of rounds of ammunition, gas masks, a quantity of potentially dangerous chemicals and a wallet, which had been taken from Gallagher (see supra).

According to the appellant's pretrial admissions, the arsenal articles were in the apartment for use against the police in the event that an arrest attempt was made during their stay in that location. The Gallagher wallet was corroborative of the Coyles' participation in that particular crime.

The next assignment of error concerns the refusal of the court below to award a new trial because of after-discovered evidence.

As noted before, the killing occurred on June 5, 1959. The appellant was taken into custody on June 17, 1959. On June 19th, he met and conferred with his counsel.

The trial began on September 25, 1959. The defense was a denial and alibi. The jury's verdict was returned on November 20, 1959. Post trial motions were argued before the court en banc on March 1, 1960.

On April 4, 1960, the warden of the Holmesburg Prison, where the appellant was confined, petitioned the court for the appointment of a lunacy commission. The appointment was made and on April 9th, the commission found and reported that the appellant was then mentally ill and required hospital treatment. He was ordered committed by the court to the Farview State Hospital for the criminal insane. On September 27, 1961, the superintendent of the Farview State Hospital reported to the court that John Coyle had recovered and no longer required hospital care. On October 2, 1961, the court ordered his discharge from the hospital and transfer to prison. The court then, in an exercise of caution, appointed another sanity commission, which found, after examination, that he was completely recovered and mentally well.

On October 16, 1961, defense counsel filed additional reasons for a new trial alleging that John Coyle was legally insane and incompetent on the occasion of Kane's killing and at the time of trial. This is the first time this contention had been asserted.

The court ordered and conducted an extensive hearing on the issue, and gave both the Commonwealth and the defense every opportunity to explore and offer testimony on this phase of the case. After a careful review of everything submitted, the court en banc subsequently unanimously concluded that the appellant was not incompetent at the time of the murder or the date of trial.

A careful study of the record is convincing that the court's findings were correct, and that the testimony does not sustain the conclusion that the appellant was legally incompetent on the relevant occasions. See *Commonwealth v. Tyrrell*, 405 Pa. 210, 174 A. 2d 852 (1961), and *Commonwealth v. Jordan*, 407 Pa. 575, 181 A. 2d 310 (1962). Post trial illness had no legal effect on his guilt for a crime committed at a

time when he was competent and responsible. See, *Com. ex rel. Hudson v. Burke,* 175 Pa. Superior Ct. 241, 103 A. 2d 279 (1954), and *Commonwealth v. Updegrove,* 413 Pa. 599, 198 A. 2d 534 (1964). A new trial on this ground was, therefore, correctly denied.

The next assignment of error urges that the investigating officers refused to permit and provide the appellant with the assistance and advice of counsel before and during the periods of interrogation following his arrest, in violation of the Sixth Amendment to the United States Constitution.

A summarized recitation of the facts supported by the record, which are relevant to this question, are as follows:

The appellant was taken into custody shortly after nine o'clock a.m. on Wednesday, June 17, 1959, by the police officers of the State of Massachusetts in connection with the robbery in Middleboro, Massachusetts, outlined before. He was immediately taken to the Middleboro State Police Barracks located approximately ten miles away.

Beginning about ten-forty o'clock a.m., he was interrogated by Lt. Michael Cullinane, a Massachusetts state police detective. Before and during this questioning, it is admitted that the appellant was not advised of his right to remain silent, did not have counsel, and was not offered such assistance. By the same token, at no time was counsel requested or the slightest indication given by the appellant that the advice and assistance of counsel was desired.[6]

This interrogation by the Massachusetts state police officer resulted directly from the Middleboro, Massachusetts, robbery and the subsequent armed re-

---

[6] These facts are firmly supported by witnesses for the Commonwealth. According to the appellant's own testimony, however, he asked permission to phone a friend in Philadelphia and secure through her a lawyer but permission was refused.

sistance to arrest in that state, outlined before. In the course of this interrogation, the appellant not only admitted his criminal activity in the State of Massachusetts, but also admitted his participation in crimes in Pennsylvania, and being on the scene at the time Officer Kane was killed.

About six-thirty o'clock that evening, the District Attorney of Philadelphia, arrived at the Middleboro State Police Barracks. About nine-thirty o'clock that night, he interviewed the appellant. The questioning was directly related to appellant's criminal activity in Philadelphia and particularly his participation in the Kane killing. Before his questioning commenced, *it is uncontradicted* that the appellant was advised that he was not compelled to answer any questions; that if he wished the assistance of counsel such would be provided; also, that anything he said could be used against him in court. *It is also uncontradicted that the appellant replied that he did not need counsel.* The appellant then proceeded to more clearly detail his criminal activity in Philadelphia and particularly his presence, movements and actions at the time of the Kane killing.

On Thursday morning, June 18th, the appellant was taken before a Massachusetts district court judge, where he voluntarily waived extradition and expressed a willingness to return to Philadelphia. At this hearing, the judge offered him the assistance of counsel, which was refused. Following this hearing, he was returned to Philadelphia via automobile by police officers. The party arrived in that city about six forty-five o'clock p.m. During the trip, in the course of discussion with the accompanying officers, he was told that the court would appoint lawyers at county expense to represent him. The appellant replied, "I am guilty. Let's get over with it."

During the morning of June 18th, friends of the appellant, without his knowledge, contacted Miss Mary

Alice Duffy, a practicing lawyer in Philadelphia, to represent him. That same afternoon, she filed a written notice of her appearance on behalf of the appellant in the clerk of court's office.

Shortly after seven o'clock that same evening, without notice to Attorney Duffy, the investigating officers took the appellant to the scene of the killing, where the event was reenacted. Upon his return to City Hall, he expressed to police officers a desire to make some changes in his previous statements. There was no request for the assistance of counsel. An assistant district attorney (Mr. Peruto) was summoned, and he interviewed the appellant. A warning was given that anything the appellant said would be taken down and used against him at trial. He then recited again the circumstances surrounding the occurrence involved, altering in some instances his previous descriptions. The changes dealt only with locations and movements at the time of the crime and did not change his previous admissions that he was on the scene of the killing ready and willing to protect his brother from arrest by any action necessary.

Sometime during this interview, Attorney Duffy came to the police office in City Hall in an attempt to see her client. The testimony does not show when she arrived, nor is there any evidence to show that Mr. Peruto was immediately notified of her presence.

After the above interview was completed and arrangements made to take the appellant to a hospital for a medical examination, Mr. Peruto and the appellant were then informed of Attorney Duffy's presence and request to see Coyle. The latter refused to see her, stating that he did not want a lawyer and particularly a woman lawyer.

The next morning, Friday, June 19th, at the request of Mr. Peruto, the appellant signed the following statement: "Q. Mr. Coyle, last night, as I informed

you, Miss Mary Alice Duffy, an attorney, was in Room 117 City Hall and said that she was your attorney, having been retained by your friends. As I further informed you, you had an absolute right, and still have an absolute right to be represented by counsel at all stages of these proceedings. Am I correct in this statement? A. Yes. Q. Am I further correct in that you stated to me last night that you were not represented by counsel, and that at this time, you had no desire to be so represented? A. Right. Q. Is it still your intention as you stated to me last night that you prefer to be represented by whatever counsel that court selects and appoints to defend you? A. Yes. Q. Do you know Miss Duffy? A. No. Q. Do you desire to see or confer with her or any other attorney at this time? A. No. Q. Is this your statement given voluntarily, that is, of your own free will, and is everything stated here correct? A. Yes."

Later that day, the appellant was transferred to the Holmesburg Prison in Philadelphia. About ten o'clock p.m., Attorney Duffy appeared at the prison and requested permission to see him. Upon being informed of this, he again refused to see her. He was then permitted to see and visit with the friends from Philadelphia who had made arrangements for her services. After this, the appellant changed his mind and asked to see Attorney Duffy, which opportunity was immediately given.

The questions submitted to the appellant and his answers during the interviews with Lt. Cullinane, a Massachusetts State Police Officer, Mr. Blanc, the Philadelphia District Attorney, and Mr. Peruto, an assistant Philadelphia District Attorney, as outlined before, were stenographically recorded and introduced at trial. The inquiry follows whether or not, under the circumstances presented, there was a denial of "the assistance of counsel" during the course of these

interrogations in violation of constitutional requirements, which would render the admission of any incriminating statements on these occasions prejudicial error. Our conclusion is to the contrary.

During the course of Lt. Cullinane's questioning, the record is convincing that the appellant did not ask for the assistance of counsel.[7] We note that this, in itself, is not controlling since if such assistance were constitutionally required, the right thereto would not depend on a request: *Carnley v. Cochran,* 369 U. S. 506, 82 S. Ct. 884 (1962). However, this factor substantially distinguishes the present case from the situation presented in *Escobedo v. State of Illinois,* 84 S. Ct. 1758 (1964). Further, we do not interpret *Escobedo* to mean that counsel must immediately be afforded one taken into custody, under all circumstances, particularly where none is requested. The mere fact that appellant was unrepresented by counsel during the questioning does not invalidate admissions made against interest. See, *Commonwealth v. Graham,* 408 Pa. 155, 182 A. 2d 727 (1962); *Crooker v. California,* 357 U. S. 433, 78 S. Ct. 1287 (1958); *Cicenia v. Lagay,* 357 U. S. 504, 78 S. Ct. 1297 (1958). It is also important that when Lt. Cullinane interrogated appellant, he was not investigating the killing here in issue but rather carrying through the Massachusetts police investigation of the Middleboro robbery. The Kane killing was, therefore, not the main focal point of the interrogation but merely a corollary thereof. It was, therefore, not such a "critical stage" in the proceedings of the present case that the absence

---

[7] The verdict requires us to read the record in the light most favorable to the Commonwealth. See, *Commonwealth v. Burns,* 409 Pa. 619, 187 A. 2d 552 (1963). But more importantly, the truth of the situation stands out brightly in the record. The evidence is convincing that at that time, the appellant did not seek the aid of counsel.

of counsel would vitiate any damaging admissions as to the present issue.

Immediately before the appellant was interviewed by the District Attorney of Philadelphia, *it is uncontradicted* that the assistance of counsel was offered and rejected. This certainly constituted an intelligent waiver thereof and, under the circumstances, did not preclude any questioning in the absence of counsel on behalf of the accused.

When appellant was interviewed by Mr. Peruto on the night of June 18th, admittedly no request for counsel was made. The opportunity to restate appellant's description of the event was his own idea. It is undenied also that he was warned that anything said would be taken down and used against him in court, which is at least close to saying he had the right to remain silent. When Mr. Peruto was first advised of Attorney Duffy's presence and intercession on appellant's behalf and this was related to the appellant himself, the latter flatly rejected her assistance. This, of course, was in line with his previous conduct when offers of similar assistance were also rejected. From the sum total of all of the circumstances, it is clearly evident to us that the appellant was fully aware that the assistance of counsel would be provided if he wished it, and that as of that time, he desired to give his version of the events involved without such assistance. In this connection, it is significant to note that the appellant was not an illiterate; that he was 24 years of age; that he had completed two years in high school and three and one-half years' service in the Air Force of the United States.

Finally, even if we *assume* that the admissions made to Lt. Cullinane and Mr. Peruto were tainted with some degree of constitutional infirmity, this is not so as to the admissions made to the District At-

torney of Philadelphia County, where the uncontradicted facts manifest an intelligent waiver of the assistance of counsel. Since all statements were basically the same, the admission of the tainted statements would not require reversal. See, *Commonwealth v. Sydlosky*, 305 Pa. 406, 158 A. 154 (1931), and *Commonwealth v. Thomas*, 410 Pa. 160, 189 A. 2d 255 (1963).

With the exception of the question of the voluntariness of the incriminating statements made by the accused following his arrest, we have conscientiously considered each and every assignment of error raised by this appeal. We find nothing of sufficient import to warrant a retrial. The trial was of unusual duration and presented difficult problems. It was conducted carefully and fairly. The appellant was given wide latitude in his effort to meet the charge. The issues were thoroughly and clearly defined for the jury's consideration. The evidence amply supports the verdict.

We have deliberately refrained from evaluating the question of voluntariness as it affects the admissibility of the incriminating statements, in view of the recent decision of the United States Supreme Court in *Jackson v. Denno*, 84 S. Ct. 1774 (1964). In *Jackson*, it was held that the practice, pursued in this case and in this Commonwealth for many years, of having the jury which determines the guilt question also solely resolve the voluntariness of incriminating statements, is in violation of due process of law. It does not necessarily follow that the appellant is entitled to a new trial. However, under *Jackson*, the appellant is entitled to have a hearing consistent with the requirements of due process, separate and apart from the proceedings before the trial jury, wherein the question of voluntariness shall be determined by a Court. The Court, in *Jackson v. Denno*, supra, said

(page 1791): "It is both practical and desirable that in cases to be tried hereafter a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence. But as to Jackson, who has already been convicted and now seeks collateral relief, we cannot say that the Constitution requires a new trial if in a soundly conducted collateral proceeding, the confession which was admitted at the trial is fairly determined to be voluntary."

The case is remanded to the Court of Oyer and Terminer of the County of Philadelphia for further proceedings consistent with the Opinion of the Supreme Court of the United States in *Jackson v. Denno*. The lower court shall with reasonable promptness hold a hearing consistent with the requirements of due process to determine whether the confessions and incriminating statements of the appellant introduced in evidence at trial were freely and voluntarily given or were coerced and involuntary.

After such hearing said court is directed to report its findings and conclusions to this Court for further consideration.

Record remanded and final decision reserved.

Mr. Chief Justice BELL concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The effect of the atmosphere created by the actions of the news media and the trial tactics of the district attorney together with the admission into evidence of extraneous crimes and crimes committed during flight, the doubt as to defendant's competency, and the admission into evidence of his uncounseled statements causes me to seriously doubt that defendant's trial was as fundamentally fair as the Constitution requires. Therefore, I would grant a new trial rather than remand with reservation of the final decision.