J-S18027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARREN TWO FEATHER DIXON | : | |
| | : | |
| Appellant | : | No. 1179 MDA 2021 |

Appeal from the Judgment of Sentence Entered April 20, 2021
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005971-2018

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED:  SEPTEMBER 9, 2022**

Darren Two Feather Dixon appeals from the judgment of sentence entered after a jury found him guilty of multiple sex crimes: involuntary deviate sexual intercourse of a child, indecent assault of a person less than 13 years of age, corruption of a minor, aggravated indecent assault of a child, aggravated indecent assault of a child less than 13 years of age, and statutory sexual assault.[1] Dixon argues the court erred in admitting prior bad acts evidence. We affirm.

The Commonwealth charged Dixon with committing various offenses against his sister N.L.D. Prior to trial, the Commonwealth filed a motion *in limine* for the admission of the testimony of another sister of Dixon, J.D., who also alleged Dixon sexually abused her.

---

[1] 18 Pa.C.S.A. §§ 3123(b), 3126(a)(7), 6301(a)(1), 3125(b), 3125(a)(7), and 3122.1, respectively.

The court held a hearing on the motion *in limine*, and J.D. testified by telephone. She testified that Dixon abused her, and the abuse would occur in the basement of the family home and in Dixon's bedroom. N.T., 6/27/2019, at 19. She stated the other family members would "[m]ostly [be] in the living room watching TV" when the abuse happened. *Id.* at 19. She testified that Dixon was not capable of walking, but he is "mobile on his own willpower." *Id.* at 19. To go upstairs, he would use a cane or his hands and when moving on the first floor, he would use his wheelchair or his cane. *Id.* at 20.

J.D. testified that Dixon would say he wanted to "play[] house," where J.D. "was the mom and [Dixon] was the dad and [they] had to do things that mommy and daddy did." *Id.* She stated he would force his hands on her and touch her breasts, both under and over her clothes, and touch her vagina, both inside and outside. *Id.* at 21. She stated that Dixon would take her clothes off and if she refused, "[h]e would threaten to hurt" her. *Id.* at 22. She further testified that he slapped, pinched, and punched her. *Id.* J.D. testified that Dixon would force her onto the bed, where he would be on top, and she was not able to free herself because "his hands are massively strong." *Id.* at 23. The lower half of his body would be off to the side. *Id.* She testified he tried to make her touch his penis on one occasion and she refused. *Id.* She testified that he would be naked except for his Depends diaper. *Id.* at 27-28. She testified he first molested her when she was six or seven and it stopped when she was 10 or 11. *Id.* at 24. She stated that she "had just gotten [her] period . . . and [she] was kind of realizing what was going on and [she] told

him to stop." *Id.* When she was 15 or 16, she tried to tell her mother what had happened, and her mother "basically just told [her] that [she] was just trying to get him in trouble and that she didn't believe [J.D.]." *Id.* After she moved from the home, she learned N.L.D. was having the same problems and they talked about it. *Id.* at 25. The Commonwealth also admitted the transcript from the preliminary hearing testimony of N.L.D. *Id.* at 29.[2]

The trial court granted the motion, finding the testimony met the common scheme, plan, or design exception ("common plan exception") to the rule precluding admission of prior bad acts evidence. The court permitted the Commonwealth to introduce J.D.'s testimony and stated it would provide a cautionary instruction to the jury. Order and Opinion, filed Feb. 13, 2020, at 8.

At trial, N.L.D. testified Dixon, who was her older brother, sexually assaulted her "for years." N.T., Oct. 19, 2020, at 101. She stated the abuse began when she was around six years old, and occurred at the family home, in the den, bedroom, kitchen, and living room. *Id.* at 101-02. N.L.D. testified Dixon would touch her vagina, butt, and breasts with his hands, tongue, and mouth. *Id.* at 103-04. He would "mostly rub" her vagina and "try to go in,"

_____

[2] The Commonwealth also admitted the transcript of the preliminary hearing testimony of A.H.D., another sister of Dixon. In a separate case, docketed at CP-67-CR-0005970, the Commonwealth charged Dixon with offenses related to the alleged abuse of A.H.D. The cases were to be tried together. When the case was on the trial list, the Commonwealth moved to sever the cases due to a medical concern of one of the victims. N.T., Oct. 15, 2020, at 2. Dixon did not object to the severance and the trial court granted the motion.

which he sometimes did. *Id.* at 104. He would also put his mouth and tongue over her vagina. *Id.* at 105. She testified he would take her clothes off and put them on the floor or around her ankles. *Id.*

She testified that he sometimes bribed her to have her show parts of her body and would play "[h]ouse," where she would be the mother and he would be the father. *Id.* at 107. She stated playing house "would start off talking and just acting like parents, then it would end up with [her] on . . . top of him or him touching [her] body or kissing." *Id.* at 108. She stated he would take off his depends and have her sit on his penis when she was not wearing clothes. *Id.* at 109. She further testified to events that occurred in a hotel in North Carolina, where Dixon, N.L.D., and their parents were staying, with her parents staying in a different room. *Id.* at 112-13. Dixon forced himself on her, touched her breasts, and tried to penetrate her vagina with his penis. *Id.*

N.L.D. testified that if she said no, Dixon would get aggressive, he would raise his voice and force himself on her. *Id.* at 111. If she tried to get away, he would get physical and hold her down with his hands, grab her by the neck, or pull her hair. *Id.* at 119. She testified that Dixon was paralyzed from the waist down but could get around "with his hands, like scooting, with the wheelchair, or canes or a walker." *Id.* at 113-14. To her knowledge, Dixon could not get an erection. *Id.* at 114.

N.L.D. said she was "roughly" 14 when the abuse stopped. *Id.* at 116. The last time he did what she had termed "going down on her," was when she was 11 or 12. *Id.* 116-17. She testified the abuse stopped happening because

she was more aware, and knew something was not right, and she "was feeling uncomfortable so . . . would tell him no a lot." *Id.* at 117. Saying no was different as she got older because she could defend herself. *Id.* She further testified that Dixon started coming up to her bedroom when she was nine or ten, and this stopped when she was 12 or 13, when Dixon got his first girlfriend. *Id.* at 148. She told her parents when she was around eight years old. *Id.* at 119. She testified that things got worse after that. *Id.* She also told an ex-boyfriend and she told her mom three or four times, with the most recent being when she was around 16. *Id.* at 120. She testified that nothing changed after telling her mother. *Id.*

J.D. then testified. In addition to the events she testified to at the hearing on the motion *in limine*, she further testified that she was in the basement the last time Dixon abused her. *Id.* at 159. Dixon asked her to lift her shirt, and she said no. *Id.* There was a "scuffle," and after that he locked her in the basement for hours. *Id.* She further elaborated that when he hit her, he would use his metal cane, his hands, a bb gun, or anything that was around. *Id.* at 159-60.

The executive and clinical director of Turning Point Counseling and Advocacy Center, Amber Crawford-Wagman, testified as an expert in the area of victim behavior and victim responses to sexual assault. N.T., Oct. 20, 2020, at 183, 186-87, 187-97. Further, a detective with the Special Victims Unit in the York City Police Department, Detective Tiffany Pitts, testified. She said that she had spoken with N.L.D., J.D., and their parents. She testified that her

interaction with Dixon's mother was "[n]ot pleasant at all." ***Id.*** at 200. The mother was very agitated and advised Detective Pitts "that everything was a lie." ***Id.*** She testified that when Dixon came to the police station, he walked up the front steps with crutches or braces. ***Id.*** at 201.

The court provided the following cautionary instruction regarding J.D.'s testimony:

> You have heard evidence tending to prove that the Defendant engaged in improper conduct regarding an incident in North Carolina and his interactions with [J.D.]. This evidence is before you for a limited purpose, that is, for the purpose of tending to show the Defendant's intent, a course of conduct, and a general scheme or plan. This evidence may not be considered by you in any other way for the purposes other than [for] the purposes I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies for which it might be inclined to infer.

N.T., Oct. 20, 2020, at 255.

The jury found Dixon guilty of involuntary deviate sexual intercourse of a child, indecent assault of a person less than 13 years of age, corruption of a minor, aggravated indecent assault of a child, aggravated indecent assault of a child less than 13 years of age, and statutory sexual assault. The jury found the indecent assault occurred both before and after Dixon's 18th birthday. The trial court sentenced Dixon to an aggregate term of 15 to 30 years' incarceration. Dixon filed a post-sentence motion, which the trial court denied. Dixon filed a timely notice of appeal.

He raises a single issue:

> Did the trial court abuse its discretion in allowing extensive evidence of the sexual abuse allegations of one of Darren Two Feather Dixon's sisters at his trial on another sister's allegations, as the court commingled the "common [plan]" and "signature" exceptions to Rule 404(b), the evidence in question fit neither exception, and the evidence was more prejudicial than probative in any event?

Dixon's Br. at 5.

Dixon argues the court erred when it allowed the Commonwealth to present the testimony of J.D. under the common plan exception to Rule 404(b). He claims the court comingled the common plan and signature crime exceptions. He points out that the trial court stated that J.D.'s testimony "would support the signature of the same perpetrator." Dixon's Br. at 25 (citing Trial Court Op. and Order, Feb. 13, 2020, at 5) (emphasis removed). He cites dissenting and concurring opinions in *Commonwealth v. Hicks*, noting the dissent discussed how the exceptions are often comingled, but are distinct and have different requirements, and a concurring opinion agreeing that the exceptions have been blended. *Id.* at 25 (citing *Commonwealth v. Hicks*, 156 A.3d 1114, 1142-57 (Pa. 2017 (Donohue, J., dissenting), *Hicks*, 156 A.3d at 1130 (Saylor, C.J., concurring)).

Dixon argues that the evidence was not admissible under either exception. He claims evidence of J.D.'s allegations do not fit the common plan exception because the allegations "do not support an inference that [Dixon] conceived of a single, overarching plan encompassing each of the prior acts and the charged crime." *Id.* at 26 (quoting *Hicks*, 156 A.3d at 1143 (Donohue, J. dissenting)). He notes it is not obvious "that committing the prior

- 7 -

act 'was part of his purpose' in committing the charged crime." ***Id.*** (quoting ***Hicks***, 156 A.3d at 1144 (Donohue, J. dissenting)). He cites ***Commonwealth v. Coyle***, 203 A.2d 782, 789 (Pa. 1964), for the proposition that the common plan exception required more than shared similarities or a logical connection. He points out that in ***Coyle***, the crimes were part of a single, overarching plan to commit murder, as the robbery of a victim, the stealing of a victim's car, the holdup of another location, and resisting arrest "were all means employed to escape arrest" for the murder. Dixon's Br. at 27 (citing ***Coyle***, 203 A.3d at 789). He claims that here the Commonwealth alleges Dixon committed distinct crimes over several years, not that he abused one sister to cover up his abuse of the other.

Dixon further maintains the allegations did not meet the signature exception. He argues the allegations were similar in that they involved a close relative, but contends a familial relationship between the perpetrator and victim is common in cases of sexual abuse of children. He further points out there were differences in the allegations, including that the abuse ended when the victims were different ages and for different reasons. He also notes that J.D. stated that Dixon used only his hands, but N.L.D. said he used his hands, tongue, and penis. Dixon further claims the signature exception "presupposes that the crimes in question were definitely committed, and are so strikingly similar that it is unrealistic to think they were committed by different people." Dixon's Br. at 29-30. Here, Dixon's defense was that the crime did not happen.

Dixon further claims the evidence was more prejudicial than probative. He claims that because the evidence did not establish a common plan or signature, it was not probative of any matter before the jury. Further, he notes that just because evidence is helpful to the Commonwealth does not make it admissible. He notes that bad acts evidence allows a fact finder to generalize the bad act into bad character "and tak[e] that [to] rais[e] the odds that [the defendant] did the later bad act now charged." Dixon's Br. at 33 (citation omitted). He notes the dangers are more pronounced in a sexual assault case. He further argues that in permitting the evidence the court noted that N.L.D.'s case would be tried with her sister A.H.D., but the cases were severed before trial and A.H.D's testimony was not presented to the jury.[3]

The admissibility of evidence is within the discretion of the trial court. ***Commonwealth v. Saez***, 225 A.3d 169, 177 (Pa.Super. 2019) (quoting ***Commonwealth v. Gill***, 206 A.3d 459, 466 (Pa. 2019)). We will not find that the trial court abused its discretion in making an evidentiary ruling "merely because [we] might have reached a different conclusion," but will do so only where the decision was "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Id.*** at 178 (citation omitted).

---

[3] Dixon further argues that the admission of J.D.'s testimony was not harmless. Because we conclude the trial court did not abuse its discretion in admitting the evidence, we will not reach whether any error would be harmless.

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, such evidence may be admissible for another purpose. Pa.R.E. 404(b)(2). One such other purpose is that "evidence of other crimes or acts may be admitted if such evidence proves 'a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others.'" **Saez**, 225 A.3d at 178 (quoting **Commonwealth v. Einhorn**, 911 A.2d 960, 967 (Pa.Super. 2006)). "A common [plan] may be relevant to establish any element of a crime, where intent may be shown through a pattern of similar acts." **Id.** (quoting **Einhorn**, 911 A.2d at 967). "The degree of similarity is an important factor in determining the admissibility of other crimes or bad acts under" the common plan exception. **Id.** (quoting **Einhorn**, 911 A.2d at 967).

Courts consider the following when determining whether evidence is admissible to establish a common plan: "the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator." **Id.** at 180 (quoting **Commonwealth v. Tyson**, 119 A.3d 353, 359 (Pa.Super. 2015)). The trial court must "engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative." **Id.** (citation omitted). The trial court must also "assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of

fact." *Id.* (citation omitted). "[T]he court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations." *Id.* (citation omitted).

In *Saez*, this Court concluded the trial court did not abuse its discretion in admitting evidence under the common plan exception. There, the defendant was convicted of sexual assault crimes following allegations by his stepdaughter that he had sexually abused her. *Id.* at 172 (citation omitted). The stepdaughter testified that the abuse started when she was nine and occurred in her bedroom, which was initially on the second floor but then moved to the attic. She said the abuse also took place in the kitchen and once in the living room. He would grope her chest and "where she goes to the bathroom," and would approach her when her mother was not at home.

The trial court in *Saez* allowed another alleged victim of the defendant, his biological daughter, to testify regarding the defendant's abuse of her, which also occurred in the attic bedroom. *Id.* at 179. The trial court reasoned that although there was a slight difference in the victims' ages, "the similarities between the incidents . . . merited inclusion." *Id.* (citation omitted). The court noted both girls were young and away from protective family members and in their bedrooms when the abuse occurred. *Id.* (citation omitted). The court noted the attacks overlapped in time and the probative value far outweighed

the prejudice, noting the court had issued a cautionary instruction. ***Id.*** (citation omitted).

Here, the trial court found the evidence admissible as evidence of a common plan. It reasoned the testimony of J.D. was "substantially similar" to N.L.D.'s testimony, including that both were Dixon's sisters and the assaults took place in the family home. Opinion and Order at 5. The court further noted the assaults were not remote in time. ***Id.*** at 6. In its 1925(a) Opinion,[4] the trial court noted the following shared characteristics, which show a logical connection between the assaults: the victims were Dixon's biological sisters, the assaults occurred in the family home, the conduct mainly involved the victims' breasts and vaginas, if the victims resisted, Dixon would physically abuse or threaten them, and each victim said Dixon called the sexual activity "playing house." Trial Court Opinion, filed Dec. 9, 2022, at 2. The court further noted Dixon claimed N.L.D. fabricated the claims based on the prompting of J.D. and due to impossibility due to his disability. Therefore, the probative value outweighed any unfair prejudice. ***Id.*** at 2-3. It pointed out the

---

[4] The Honorable Michael E. Bortner issued a decision on the motion *in limine*. Trial was before the Honorable Gregory M. Snyder, who also issued the Rule 1925(a) opinion. We note that the additional similarities referenced in the Rule 1925(a) opinion were present at the time of the hearing on motion *in limine*. When discussing the similarities between J.D.'s testimony and N.L.D.'s preliminary hearing testimony, the Commonwealth noted both described the conduct as "playing house," and both testified that Dixon would physically abuse or threaten them, and the allegations involved the breast and vaginal area. N.T., 6/27/2019, at 32-33.

cautionary instruction properly informed the jury of the limited purpose for which the testimony was admitted. ***Id.***

The court did not abuse its discretion in finding J.D.'s testimony admissible under the common plan exception to Rule 404(b). Both allegations involved Dixon's sisters, the abuse occurred in the family home, the victims detailed similar abuse, and both were told by Dixon that they were "playing house." The testimony showed sufficient similarity to allow the court to determine a logical connection existed. ***See Saez***, 225 A.3d at 180; ***accord Commonwealth v. Aiken***, 990 A.2d 1181, 1185-86 (Pa.Super. 2010) (finding no error in admitting evidence under the common plan exception, noting the two alleged incidents were "markedly similar," as the victims were of like ages and were defendant's biological daughters, and in both instances defendant initiated the contact by showing a pornographic movie during an overnight visit ).

Although the dissent and concurrence in ***Hicks*** contended that courts have blended the common plan and signature exceptions, they made no binding pronouncements regarding the exceptions.[5] 156 A.3d at 1144-56 (Donohue, J. dissenting). Further, that the trial court used the word "signature" did not alter its finding, which was that the evidence was

---

[5] In ***Hicks***, among other things, the court affirmed the trial court's admission of evidence under the common plan exception; however, only two justices joined the author of the main opinion for the section of the opinion finding the court did not abuse its discretion in applying the exception. Two justices filed concurring opinions agreeing the evidentiary order should be affirmed, but setting forth different reasoning, and two judges filed dissenting opinions.

admissible as a common plan. Although some cases involving the common plan exception – such as **Coyle,** cited by Dixon – were cases where crimes occurred to escape or cover-up a different crime, that is not a requirement of the exception. **See Saez**, 225 A.3d at 180; **Aiken**, 990 A.2d at 1185-86. Further, the court did not err in concluding the evidence was probative and its probative value outweighed any unfair prejudice. The evidence rebutted Dixon's claims of fabrication and impossibility. Moreover, the cautionary instruction informed the jury of the testimony's limited purpose.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/09/2022