## Bowles *v.* Pittsburgh, Appellant.

Argued March 27, 1941. Before Schaffer, C. J., Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Anne X. Alpern,* First Assistant City Solicitor, with her *William Alvah Stewart,* City Solicitor, and *John F. McDonough,* Assistant City Solicitor, for appellant.

*Charles J. Margiotti,* of *Margiotti, Evans & Pugliese,* with him *Robert B. Ivory,* for appellee.

Opinion by Mr. Justice Patterson, June 30, 1941:

This is an action in trespass instituted by Harry H. Bowles, appellee, against the City of Pittsburgh, appellant, for injuries sustained by him when an automobile in which he was riding as a passenger plunged from the south tower of the Stieren Street Bridge to the pavement below, allegedly because of the City's negligence in failing properly to maintain and repair the structure.

The Stieren Street Bridge, constructed in 1890 over the tracks of the Pittsburgh, Ft. Wayne and Chicago

Railroad, is approached on the north from Verner Street, crosses the railroad, and continues in a southerly direction to Benton Street where, at the south tower, it turns at a ninety-degree angle to the east, and traffic descends upon a ramp to the vicinity of Porter Street. The south tower is supported on four steel columns and its wooden flooring planks are fastened to stringers which, in turn, rest upon angle irons and steel girders. Because of the sharp angle at which the ramp meets the bridge, the flooring of the square formed by the columns of the south tower is composed of two right-angle triangles, the planks of which are laid in opposite directions, and, at the intersection of these triangles, the stringers are supported upon a steel beam running diagonally from the southwest to the northeast column of the square. The automobile in which appellee was riding entered the bridge from the north, crossed the span over the railroad tracks, and was about to make the ninety-degree turn to the left when, according to his version of the accident, the floor of the tower collapsed, throwing the car over a guard rail, across a footwalk, and to the street below. The City's eyewitness asserted, however, that the car approached the turn too rapidly, failed to negotiate it, and drove over the guard rail.

To establish that the accident was caused by a failure of the bridge flooring and by the negligence of the City in neglecting to keep it in proper repair, appellee produced two witnesses who testified that prior to May 5, 1934, the date of the accident, there was a separation in the floor system of the south tower. One witness stated that, in 1933, he observed a one-inch separation at the northeast corner of the tower, extending along the diagonal and diminishing in size until it disappeared at a point near the center of the square; the other, in answer to a question by appellee's counsel as to what the witness observed at the northeast corner of the tower, testified that, in January and February of 1934, he had observed an opening of from three to four inches between the boards of the triangles, but subsequently located the opening at

the northwest corner. Two expert witnesses, called by appellee, testified that the separation of the flooring was caused by "centrifugal force", generated by automobiles in executing the right-angle turn at the tower, which they stated caused a movement of the stringers to which the flooring was attached that continued progressively until some of the stringers became dislodged from the supporting girders, as a result of which the floor collapsed. On cross-examination, both experts admitted they had not computed the force necessary to move, even infinitesimally, the flooring and stringers, but stated that such computation was unnecessary to their conclusion that the constant flow of traffic from 1931, when the tower was last repaired, to 1934, had gradually produced the condition evidenced by the visible separation of the planking.

Appellee also attempted to prove an increase in traffic over the bridge by the testimony of three witnesses. The first of these, Frank Sherba, testified that traffic over the bridge remained the same from 1925 to 1930. In answer to the question: "Well, did it increase after 1930?" he replied, "Very little". He also stated that only five or six cars crossed the bridge daily in 1934. The second witness, Steve Harsh, was asked: "From what you observed from 1926 on to 1934, did traffic increase or decrease", and answered: "Seemed to me increased". Counsel persisted and elicited the following testimony: "Q. . . . Will you state whether or not there was a gradual increase? A. Well, I couldn't swear to that. Q. I mean from time to time as years went on? A. Seemed more machines traveling through there." This witness did not attempt to estimate the number of cars, but said there was "quite a bit" of traffic and "plenty" of traffic, and that it was heaviest in the summer months. The third witness, Michael Gnipp, underwent the following examination: "Q. What I want to know is whether the same or increased? A. It increased as the years went by I guess. Q. I don't want you to guess about it, do you know? A.

Yes, it increased. . . . Q. Will you state whether or not the completion of the Ohio Boulevard increased or diminished traffic over this bridge? A. I would say it increased the traffic. Q. How much? A. Increased it a good bit. Q. What do you mean by a good bit? A. I would say about 100 per cent". The same witness testified that about 100 cars a day passed over the bridge after the completion of the Boulevard in 1930. In addition to this testimony, appellee introduced a letter, written to the City, in 1930, by an official of the Pennsylvania Railroad Company, calling its attention to a temporary increase in traffic over the Stieren Street Bridge during the period of construction of the Boulevard and the abutment of the North Side-McKees Rocks Bridge.

Upon this evidence, appellee contended that the City had actual and constructive notice of an increase in traffic over this bridge, that it should have known of the progressive weakening of the structure by "centrifugal force", as evidenced by an aperture in the flooring existing for a year prior to the accident, and that it was negligent in failing to repair the bridge and in not strengthening it by installation of bridging and separators between the stringers of the south tower. The jury found for appellee, whose injuries were serious, in the amount of $18,000, whereupon the City filed motions for judgment n. o. v. and for a new trial. These motions having been refused by the court en banc, the City has taken this appeal.

The admission of testimony by appellee's experts concerning the alleged absence of bridging and separators between the stringers is assigned as error by the City, on the ground that this evidence related to negligence in the construction of the bridge and its original design, which was not pleaded. Under the decision of this Court in *Gehringer v. Lehigh County*, 231 Pa. 497, it was the duty of the City to so strengthen the existing bridge structure as to make it safe for the type of traffic to which it was open and, if the jury believed the testimony of these wit-

nesses that bridging and separators were necessary to maintain the bridge in a safe condition and that the City's failure to thus strengthen the bridge contributed to appellee's injuries, it was entitled to take these facts into consideration upon the issue of negligence pleaded. We are of opinion, therefore, that this evidence was properly admitted. The remaining questions relate solely to the manner in which appellee's experts were permitted to be examined, and in passing upon them we are not concerned with the credibility of these witnesses or what weight their testimony was entitled to receive, these matters having been properly submitted to the jury by the charge of the trial judge.

In questioning the first of the experts, Rice, appellee's counsel asked if he had heard the testimony of the preceding witness for appellee "with reference to a separation in the flooring of the bridge running from the northeast corner along the steel girder toward the center of the girder, it being, in 1933, about an inch at the northeast corner in a southwesterly direction and tapering off, and in January or February, 1934, *that* separation being from three to four inches and running to about the center of the girder". When the witness stated that he had heard such testimony, he was then asked: "State, Mr. Rice, what, in your professional opinion, *that* separation indicated if anything?" The witness was permitted to answer. And, during the course of his examination, the witness said: "In '33 there was a separation running from an inch at this corner down to nothing about the middle of the span. In '34 that opening still maintaining no width about the center had enlarged to about four inches". He then proceeded to draw conclusions from these "facts", which he asserted had been established by the testimony of appellee's witnesses. The second witness, Sprague, was similarly questioned, as follows: "I want you to state whether or not you heard the description of the opening, the aperture, occurring at the northeastern section of the diagonal girder, that is, beginning at the northeastern section and extending to about the

center of the girder, running about an inch to approximately nothing, in the summer of 1933, and in January and February of 1934 *that* opening ran from three to four inches at the northeastern corner of the girder and extending to at or about the center of the girder. Did you hear that testimony? A. I did. Q. Will you state, Mr. Sprague, what significance you attach to *that* opening?" This witness also was permitted to answer over objection.

Instead of seeking responses to hypothetical questions in the customary manner, counsel for appellee thus stated, in the presence of the jury, that his witnesses had previously testified to an aperture at the northeast corner of the tower that increased in size from one inch to four inches between 1933 and 1934, and the expert witnesses accepted and repeated these statements as the established facts. Actually, one of appellee's witnesses had testified to a one-inch opening in the floor at the northeast corner of the tower, and another had related that there was an aperture of three to four inches at the northwest corner of the tower. It may be, as counsel suggests, that this contradiction was a mere "lapsus linguæ", but he did not avail himself of his opportunity to have the apparent contradiction explained by the second witness, and the matter was one for the jury alone to reconcile. By asserting that the evidence established a single, increasing aperture at the northeast corner, counsel was clearly usurping the function of the jury; he was stating as an established fact that this was the evidence, whereas the record indicates that it was not the evidence. The same observation applies to counsel's examination of the witness Sprague with regard to the effect of an increase in traffic over the bridge. Sprague, who had testified that, in 1914, he, as engineer for the City, had approved specifications for repairs to the structure which omitted bridging and separators between the stringers, was asked by counsel whether such repairs would have been sufficient in 1931, "particularly with reference to increased traffic over the bridge". When it was objected that the evidence of appellee's witnesses as to an increase

in traffic was conflicting, counsel restated the question in hypothetical form, asking the witness to assume that there had been an increase in traffic. This was proper, but, of course, the answer of the expert witness was irrelevant if, as a matter of fact, there was no evidence from which the jury could properly be permitted to infer that there was such an increase.

While the court may, within limits and in the exercise of a sound discretion, permit an expert witness to express an opinion upon a defined portion of the testimony given in behalf of one of the parties and made known to him either by his reading or hearing it, which is not contradictory in itself and the truth of which he expressly assumes for the purpose of his opinion, and need not require that the facts be incorporated in one hypothetical question, since, as was pointed out in our leading case on the subject, *Yardley v. Cuthbertson*, 108 Pa. 395, 450-51, "in either case the opinion is sought upon an assumed state of facts" and "the witness in either case determines none of the facts himself", we find no warrant in any of the decisions for the form of examination here permitted. In *Coyle v. Commonwealth*, 104 Pa. 117, and *Kelly v. Watson Coal Co.*, 272 Pa. 39, the expert witnesses based their opinions upon evidence they were asked to assume to be true, which they had heard or read in the record and which, like that whereon the expert was permitted to express an opinion in *Laudenslager v. Penna. P. & L. Co.*, 312 Pa. 169, was "consistent throughout and not self-contradictory". Here, the experts did not base their opinions upon a defined portion of the evidence, read or heard by them, the truth of which they were asked to *assume*, but upon facts which counsel *told* them the witnesses had testified to, and they were permitted to repeat to the jury that these asserted facts had been stated by the witnesses; moreover, the testimony of appellee's witnesses was not "consistent throughout and not self-contradictory". In view of the obviously dangerous tendency of such a form of examination to mis-

lead the jury, the admission of the answers of the experts elicited thereby, in violation of these well established limitations upon the rules relating to examination of expert witnesses upon a state of facts developed at the trial, was clearly erroneous and constitutes reversible error. See *Howarth v. Adams Express Co.,* 269 Pa. 280; *Pietro v. P. R. T. Co.,* 298 Pa. 423. Justice can be served only by requiring that the case be tried again.

Judgment reversed and a venire facias de novo awarded.