Alvin H. **FRANKEL**, Administrator of the Estate of Anthony **Recchia**, Deceased,

v.

**LULL ENGINEERING COMPANY**, Inc.

The **RANSOME CORPORATION**

v.

Guido Carl **RECCHIA**, individually and trading as G. C. Recchia Brickwork.

Civ. A. No. 40217.

United States District Court, E. D. Pennsylvania.

Oct. 22, 1971.

David F. Binder, Richter, Syken, Ross, Binder & O'Neill, Philadelphia, Pa., for plaintiff.

F. Hastings Griffin, Dechert, Price & Rhoads, Philadelphia, Pa., for Ransome Corp.

J. Grant McCabe, David L. Steck, Rawle & Henderson, Philadelphia, Pa., for Lull Engr. Co.

Daniel J. Ryan, LaBrum & Doak, Philadelphia, Pa., for Guido Recchia.

## OPINION AND ORDER

FULLAM, District Judge.

Before the Court in this personal injury action are defendants' post-trial motions.

The action arose out of an accident at a construction site on July 24, 1965, when a high-lift loader overturned and crushed plaintiff's decedent, the loader's operator. Defendant Ransome was the dealer who sold the machine to the contractor, Guido Carl Recchia, the third party defendant, who employed plaintiff's decedent. Defendant Lull was the manufacturer of the machine.

The following facts are essentially undisputed. Plaintiff's decedent, Anthony Recchia, employed by his twin brother, Guido Carl Recchia, was operating a Lull 4D-40 high-lift loader at the construction site. This machine, similar to a large lift truck, rides on four large, tractor-type tires. Mounted on the front of the loader is the boom, a large hydraulically operated steel framework which can be raised in the air. Mounted perpendicularly to the ground at the end of the boom is the "mast" on which the forks used for carrying the load are mounted. The forks can be raised and lowered on the mast.

The loader was being used to move planks and scaffolding from the top of the completed first story of one building

to the top of the first story of another. The top of the second building was about 10 feet from the ground. When the scaffolding was placed on the forks it hung down below them so that the forks had to be raised high enough for the bottom of the scaffolding to clear the top of the building. The ground at the side of the building where the accident occurred was level to a point about 10 feet away from the building, then sloped downward away from the building. The slope, estimated at 15 or 20 percent, ran for about 20 feet and then began to level off.

The accident occurred as plaintiff's decedent finished delivering the third load of scaffolding. After the scaffolding had been removed from the forks, the machine began to back away. As it did, a man on the building's roof noticed the boom beginning to swing. Plaintiff apparently attempted to jump clear of the machine but was crushed by one of the arms of the boom as the machine toppled over on its side.

Plaintiff's theory of the accident was that as Anthony Recchia backed away from the building after completing his third trip, the loader's defective brakes prevented him from stopping so he could lower the boom before moving down the slope and going to get another load. As the loader continued to roll backward, the defect in the steering resulted in the loader turning. These movements of the loader combined with its inherent unreasonable instability caused the loader to tip over. Lull's position was that, while the loader was certainly not unreasonably unstable, Ransome may have been partially responsible for the accident by supplying a loader with defective brakes and steering, for which it was solely responsible and which, when coupled with the operator's negligence in failing to lower the boom all the way before moving the machine, caused the machine to go out of control and turn over. Ransome, on the other hand, took the position that the brakes and steering were not defective; that there was no proof they caused the accident; and that the real cause of the accident was the loader's inherent instability.

At the conclusion of an eight-day trial, the jury, responding to special interrogatories, found:

1. The accident occurred because the "loader was in a defective condition, unreasonably dangerous to the user."

2. The loader was in an unreasonably dangerous condition because of defects in design, brakes and steering, all of which combined to cause the accident.

3. Lull was responsible for the defect in design and Ransome for the defects in brakes and steering.

4. Anthony Recchia did not assume the risk with respect to any of the defects.

5. The loader was not in a defective condition unreasonably dangerous to the user because of the absence of seat belts or an enclosed cab.

6. Lull and Ransome were both negligent and their negligence was the proximate cause of the accident.[1]

7. Guido Recchia was either not negligent or his negligence was not a proximate cause of the accident.

8. Anthony Recchia was not guilty of contributory negligence.

Thus, liability was imposed against both defendants, and the third-party defendant was exonerated. After the jury returned their findings on the liability issues, the parties agreed that damages amounted to $250,000.

Both defendants raise numerous issues in the briefs in support of their post-trial motions. Since Lull and Ransome

1. Interrogatories relating to negligence were included solely at the behest of plaintiff. (N.T. 819–20, 824–26.) Neither defendant suggests that facts which would permit imposition of liability on a negligence theory would not also permit imposition of liability under the principles of strict liability in tort. Accordingly, issues specifically relating to negligence will not be further discussed.

take quite different positions on the issues in the case, their motions will be discussed separately except where they relate to their liability *inter se.*

### Ransome's Motion for Judgment N.O.V.

Ransome asserts two grounds for judgment n. o. v.; first, that plaintiff failed to prove proximate cause and, second, that Anthony Recchia assumed the risk of the accident.

In support of its first ground, Ransome argues that the testimony of Epps and Korth, the two eyewitnesses to the accident, was that the accident occurred on substantially level ground after the loader had moved only about four feet from the building at very low speed. Ransome further points out that there was no direct evidence that Anthony Recchia applied the brakes or that a defect in the steering gear caused the loader to move in a direction that he did not intend. Ransome concludes "it is highly *improbable* that in the few feet of motion and at the very slow speed involved, this turnover had anything to do with brakes or steering." (Ransome Brief at 5.) Ransome also asserts that the opinions of plaintiff's experts that defective brakes and steering played a role in bringing about the accident were both insufficiently definite and without an adequate factual foundation and that, therefore, the opinions added nothing to plaintiff's case on causation.

■ Plaintiff's burden on the causation issue was to prove that it was more probable than not that defective brakes and steering were a substantial factor in bringing about the accident. There being no direct evidence on the causation issue in this case, plaintiff was forced to rely on circumstantial evidence. The definitive statement of the circumstantial evidence required in Pennsylvania (Kridler v. Ford Motor Co., 422 F.2d 1182, 1183–1184 (3d Cir. 1970)) to permit the jury to determine causation is found in Smith v. Bell Telephone Co., 397 Pa. 134, 153 A.2d 477 (1959). *Kridler, supra;* Denneny v. Siegel, 407 F.

2d 433, 439–440 (3d Cir. 1969) ; Jones v. Treegoob, 433 Pa. 225, 229–230, 249 A.2d 352 (1969). *Smith* abrogated the earlier rule that a jury would not be permitted to determine causation where the evidence could establish a number of reasonably probable causes. Instead, *Smith* held "that the evidence [need only] be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff * * *." *Smith,* 397 Pa. at 138, 153 A.2d at 479.

Although parts of the testimony of Epps and Korth support Ransome's description of the occurrence of the accident, Ransome's characterization of the essence of their testimony is inaccurate. Accordingly, to apply the rule of *Smith* to this case, it is necessary to summarize the testimony of these two witnesses and some of the other evidence in the case.

Epps was on top of the building to which the loader was delivering materials and, when the accident occurred, was in a position to see only the top part of the boom. However, the jury could have fairly found from Epps' testimony that after the load had been deposited, the boom began to move slowly away from the building, did not stop as it had in the past, and then tipped and fell over. (N.T. 70, 73–74.)

Korth had been watching the construction activity from the window of a restaurant about 300 feet from the accident. The jury could fairly have found from his testimony that he had seen the loader make two deliveries to the side of the building where the accident occurred. (N.T. 413.) After each of those deliveries, Anthony Recchia backed up the loader seven to ten feet from the building, lowered the boom, and backed straight down the hill. (N.T. 423, 426.) When he arrived at the bottom of the slope, he turned 90 degrees and went to get a new load. On the third trip, as the loader was being unloaded, all four wheels were on the level ground near the building. When unloading was completed, the loader backed up but did not come to a complete stop. (N.T. 427.)

The machine then started down the slope and at the same time the rear of the loader began to turn to the operator's right. (N.T. 418, 428.) Simultaneously, the boom began to tip and the operator began to leave his seat. (N.T. 414, 428.)

The police officers who investigated the accident testified that the loader was found on its left side at the foot of the slope, the operator crushed beneath one arm of the boom. (N.T. 86, 97.) In the process of coming down the slope, the rear of the loader had turned 45 or more degrees to the operator's right. (N.T. 89–92, 109.)

Finally, the jury had evidence from which it could reasonably find that after the accident the brakes and steering were defective and that the loader could have been stopped very quickly at low speeds if its brakes had functioned properly. (N.T. 148, 150–51, 165, 240–49.)

From the foregoing facts the jury could reasonably infer that the tipover was a dynamic process, that the loader did not just suddenly fall over, but rather fell over as a result of its movements. Several facts then could reasonably lead to the inference the operator was unable to stop, and had difficulty steering. The fact that the operator did not stop the loader's slow movement when the boom began to tip, given the reasonable assumption that an experienced operator would attempt to avoid the tipover by stopping the machine, would indicate that the operator could not stop it. The fact the operator proceeded to encounter the slope at an angle, with boom part way up, as he had not done before, would indicate, first, that he could not stop the machine and, second, that he lacked control over its direction of travel. Finally, Korth testified that the loader "did not come to a complete stop" after backing away from the building. (N.T. 427, 431.) One reasonable inference from this testimony would be that the loader slowed down, implying a partially successful application of the brakes.

Ransome's repeated assertion that the loader tipped over on the level ground near the building is completely inconsistent with the whole of the testimony of Epps and Korth and the other evidence in the case. But even if it is assumed that the loader ran over some object on the level ground which tipped it enough to cause it to fall over, the jury could reasonably have made similar inferences. That is, the jury could have found that the operator was unable to prevent the machine from running all the way up on the object because he could not stop, and was unable to avoid the object because he could not steer.

In short, the jury could have reasonably and logically drawn the necessary inferences to conclude that it was more probable than not that defective brakes and steering were substantial factors in bringing about this accident. Griffith v. Clearfield Truck Rentals, Inc., 427 Pa. 30, 233 A.2d 896 (1967); Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205, 1211–1214 (3d Cir. 1970).

Ransome, citing Haldeman v. Bell Telephone Co., 387 F.2d 557 (3d Cir. 1968), would have the Court find that, at most, the probabilities of a cause that would make Ransome liable are about equal with the probabilities of nonliability and that therefore plaintiff failed to sustain his burden of proof. But the Court may not weigh probabilities in deciding whether the issue of causation may be taken from the jury. Rather, the only inquiry is whether the jury could logically and reasonably arrive at a particular conclusion. And as explained above, the conclusion of the jury was both logical and reasonable. Griffith v. Clearfield Truck Rentals, supra, 427 Pa. at 36–40, 233 A.2d 896.

Since it is apparent that there was ample circumstantial evidence to support the jury's finding of causation, it is unnecessary to discuss Ransome's assertion that the expert testimony furnished no additional facts on the issue of causation.

Ransome also contends that it is entitled to judgment n. o. v. because plain-

tiff is barred from recovery by the doctrine of assumption of risk. Ransome argues that the evidence is unequivocal that Anthony Recchia knew that the brakes and steering were not working properly; that he was an experienced operator; and that he was familiar with the operation of the machine. Therefore, the argument goes, under the principles set forth in Section 496C of the Restatement (Second) of Torts, plaintiff assumed the risk as a matter of law.

Ransome also points to a transaction between Anthony Recchia, his employer, and Ransome's representative, several days before the accident. The Recchias had complained to Ransome about the difficulties with the brakes and steering, but after Ransome assured them that the loader was safe to use and that Ransome would fix anything that was wrong if they kept it, agreed to keep it. Ransome argues that this was express assumption of risk under the principle of Section 496B of the Restatement (Second).

■ Assumption of risk is a valid affirmative defense in Pennsylvania even in a strict liability case. Ferraro v. Ford Motor Co., 423 Pa. 324, 223 A.2d 746 (1966); Green v. Sanitary Scale Co., 431 F.2d 371 (3d Cir. 1970) (en banc); Elder v. Crawley Book Machinery Co., 441 F.2d 771 (3d Cir. 1971). *See* Pritchard v. Liggett & Myers Tobacco Co., 350 F.2d 479, 484–485 (3d Cir. 1965), cert. denied, 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966), amended 370 F.2d 95 (3d Cir. 1966), cert. denied, 386 U.S. 1009, 87 S.Ct. 1350, 18 L.Ed.2d 436 (1967).[2]

If Section 496B, regarding express assumption of risk, were applied to this case, a clear jury question would be presented; indeed, it can be argued that, as a matter of law, Anthony Recchia did not expressly assume the risk. First, 496B requires that plaintiff agree expressly that defendant will not be held accountable for any harm. Certainly there was no evidence in this case that Anthony Recchia by word or act expressly agreed not to hold Ransome accountable for any harm. Second, even assuming some such express agreement could be found, Ransome's assurance to the Recchias that the loader was safe to use would present a jury question relating to the scope of risk embodied in the express agreement.

■ Ransome's implied assumption of risk argument is more tenable; nevertheless, it appears that this issue also presented several obvious jury questions. The Supreme Court of Pennsylvania appears to have adopted the language of comment n of Section 402A as the standard to be applied in determining in a strict liability case whether the plaintiff assumed the risk. *Ferraro, supra*, 423 Pa. at 327, 223 A.2d 746; Elder v. Crawley Book Machinery Co., *supra*, 441 F.2d at 772–773. It is whether plaintiff "voluntarily and unreasonably proceed[ed] to encounter a known danger." Restatement (Second) of Torts, § 402A, comment n (1965). As the quoted language indicates, the standard is a subjective one which requires inquiry into the actor's state of mind. Dorsey v. Yoder Company, 331 F. Supp. 753, 765 (E.D.Pa. 1971). It was for the jury to resolve whether Anthony Reechia knew that he was encountering

2. The Scope Note to Chapter 17A of the Restatement (Second) of Torts (Sections 496A through G) which contains the sections cited by Ransome, states that these sections relate only to assumption of risk as a defense to actions based on negligence. The note refers the reader to sections 515 and 524 of the first Restatement for rules relating to assumption of risk in strict liability cases. However, the cases applying Pennsylvania law have ei-

ther applied Chapter 17A in strict liability cases, Elder v. Crawley Book Machinery Co., *supra*, 441 F.2d at 773; Ferraro v. Ford Motor Co., *supra*, 423 Pa. at 327–329, 223 A.2d 746, or have applied the general principle relating to assumption of risk set forth at comment n to Section 402A. *Ferraro, supra*. Greco v. Bucciconi Engineering Co., 407 F.2d 87, 92 (3d Cir. 1969).

the danger that the machine might go out of control and that he risked injury or whether, for example, he thought he was only taking the risk that the loader would be difficult to operate. And, secondly, before the jury could resolve this issue, it needed to resolve the preliminary issue of the effect of Ransome's representations that the machine was safe to use. Ferraro v. Ford Motor Co., *supra*.

Ransome's motion for judgment n. o. v. will be denied.

*Ransome's Motion for a New Trial*

Ransome advances three grounds in support of its motion for a new trial. It contends first that the opinion testimony of plaintiff's three experts, Ballantine (N.T. 142–228, 397–401), Grosvenor (N.T. 235–346), and Baccini (N.T. 347–395) was erroneously admitted; and, second, that the Court's charge regarding assumption of risk was inaccurate and prejudicially emphasized plaintiff's theory of causation.

■ Ransome contends that there were three things wrong with the testimony of plaintiff's experts. First, it contends that there was no factual foundation laid which would have permitted Grosvenor or Ballantine to reconstruct the accident and give an opinion as to its cause. As pointed out above, however, the evidence was adequate to support the jury's finding of causation without recourse to expert opinions on the issue. It follows, therefore, that the experts who were privy to the same information likewise had an adequate basis for their opinions. The cases cited by Ransome in support of its argument, Andrews v. Jackson, 211 Pa.Super. 166, 235 A.2d 452 (1967) and Rebmann v. Canning, 390 F.2d 71 (3d Cir. 1968), are both readily distinguishable. In *Andrews* the court found the plaintiff's expert, a police officer, incompetent to testify as to the condition of an automobile's brakes before an accident on the basis of his examination of the heavily damaged vehicle after the accident. The case certainly did not hold, as Ransome implies, that the expert

must witness the accident in order to be able to testify about it. In *Rebmann*, the admission of testimony of an investigating police officer that an accident was caused by the failure of one of the parties to heed a stop sign was error. The essence of the court's holding was that the officer's testimony was improper because he had no way of knowing whether the party had disobeyed the command of the stop sign, and that though such testimony in other circumstances might be harmless, the testimony of a state trooper concerning a traffic violation would likely be given undue weight by the jury. In the present case, plaintiff's experts had access to considerably more facts than did the police officer in *Rebmann*.

■ Second, Ransome contends that the opinions were inadmissible because none of the experts supported his testimony with the necessary underlying facts. Ransome argues that, for example, Ballantine was unable to state positively that if the tie-rod ends had been replaced the accident would not have happened (N.T. 173), Grosvenor was unable to state that he actually knew whether the operator had difficulty steering the loader or whether the operator applied the brakes (N.T. 314–15), and Baccini could not state whether something did, in fact, deflect the wheels (N.T. 384). This argument boils down to the contention that experts in order to express their opinions about an accident must know exactly how it occurred. Were this the standard, expert testimony about an accident would rarely be admissible and where the standard was met such testimony would be unnecessary. All that can properly be required is that the expert have sufficient facts to enable him to reach a rational conclusion. As explained previously, the experts had sufficient facts from which they could reach such a conclusion. Kridler v. Ford Motor Co., 422 F.2d 1182, 1185 (3d Cir. 1970); Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231 (1968). To the extent the expert opinions were based on certain

imponderables, the jury, of course, would properly accord them less weight.

■ Finally, Ransome contends that the expert opinions which incorporated such words as "may," "would tend" and "may have been" were insufficiently definite and were improperly admitted. The cases cited by Ransome do not support this proposition. One, *Warden v. Lyons Transportation Lines, Inc.*, 432 Pa. 495, 248 A.2d 313 (1968), holds that testimony by an expert qualified by words such as "possible" is, alone, insufficient to establish how an accident occurred, and the other, *Laubach v. Haigh*, 433 Pa. 487, 252 A.2d 682 (1969), holds only that the trial court may properly exclude expert opinion testimony where the expert has insufficient facts on which to base an opinion. It is quite clear both in reason and law, VII Wigmore, Evidence § 1976, 3d ed. (1940); *Bialek v. Pittsburgh Brewing Co., supra,* that it is not necessary for an expert to express a positive opinion; the jury is entitled to consider an expert's assessment of the probabilities for whatever it is worth. Reading the testimony as a whole, I am satisfied that the experts' opinions were sufficiently firm for submission to the jury.

■ Next Ransome asserts that the court's charge on the doctrine of assumption of risk was defective. The essence of Ransome's complaint is that

> "the court told the jury that even though the deceased willfully and knowingly used a machine with bad brakes, they could nevertheless find no assumption of risk in that respect if the deceased did not assume the risk of a tip-over." (Ransome Brief at 15.)

But the charge was somewhat broader than Ransome would suggest. The jury was instructed to determine, not whether the deceased assumed the risk of a tip-over, but rather whether the harm that occurred "was within the foreseeable ambit of the risk that he assumed." (N.T. 885.) In any event, Ransome apparently suggests that once it was es-

tablished that the deceased knew about the bad brakes and steering, then, as a matter of law, he assumed the risk of this accident or at least serious bodily harm arising out of some sort of accident. This proposition is unacceptable. As discussed above, the crucial issue was this operator's state of mind. Plaintiff was entitled to have the jury resolve that issue, particularly in view of the possibility that the jury could find that the deceased was influenced by the statement of Ransome's representatives that the machine was safe to use.

Finally, Ransome contends that the court unduly stressed plaintiff's theory of causation when the court stated in charging on the sudden emergency doctrine:

> "If you find, for example, that the sudden emergency was that he started back down the incline and couldn't stop the vehicle because of the failure of the brakes. * * *" (N.T. 843)

Ransome vigorously asserts that plaintiff's theory was that the accident occurred just this way and that prejudicial error was committed when this set of conclusions was suggested to the jury because there was no evidence to support the view that Anthony Recchia could have been braking the loader on the slope. Had there been no such evidence, Ransome's argument might conceivably have merit. *See* Perry v. Union Barge Line Corp., 434 F.2d 235, 236–237 (3d Cir. 1970). But, as noted above, there was ample evidence to support this hypothesis.

I have concluded that there is no justification for granting Ransome's motion for a new trial.

### *Lull's Motion for Judgment N.O.V.*

Briefly stated, Lull contends that it is entitled to a judgment n. o. v. on the grounds:

1. That there was not sufficient evidence to support a finding that the loader was "in a defective condition unreasonably dangerous to the user," the standard for finding liability un-

der Section 402A of the Restatement (Second) of Torts because

(a) there was no evidence of a design defect,

(b) the loader was not dangerous for its intended use since the accident occurred in unusual circumstances, and

(c) in any event, there was adequate warning of any defect; and

2. That the design defect, even if it did exist, was not the proximate cause of the accident.

In asserting that there was insufficient evidence to support a verdict under 402A, Lull contends first that there was no evidence that the loader was in a defective condition, i. e., that it was defectively designed. Lull argues that the condition of the product must be measured against some standard such as industry practice, standards established by a national safety organization, or a weighing of the product's dangers against its utility and the difficulty of eliminating the dangers.

A standard Lull fails to mention, but which is impliedly suggested in plaintiff's brief, is the comparison between the performance of this machine and the performance expected of a properly designed product. To put it another way, in Pennsylvania, evidence of the occurrence of a malfunction in the absence of abnormal use and reasonable secondary causes is sufficient to establish a defective condition within the meaning of Section 402A. MacDougall v. Ford Motor Co., 214 Pa.Super. 384, 257 A.2d 676 (1969); Greco v. Bucciconi Engineering Co., 407 F.2d 87, 89–90 (3d Cir. 1969); McCann v. Atlas Supply Co., 325 F.Supp. 701 (W.D.Pa.1971); Colosimo v. May Department Store Company, 325 F.Supp. 609, 612 (W.D.Pa. 1971); Sellers v. Sharon Chrysler-Plymouth, Inc. (No. 2), 50 Pa.Dist. & Co. R. 2d 179, 181–182 (1970). *See* Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231 (1968); Kridler v. Ford Motor Co., 422 F.2d 1182, 1185 (3d Cir.

1970). In the present case, the jury could reasonably have found that the loader's maneuvers just before the accident were within the range of maneuvers that this machine would be expected to perform during normal use. A finding that the loader fell over during such normal use is sufficient to justify the conclusion that the loader was defective in design.

Lull takes the position in its reply brief that this principle applies only to cases involving a "mechanical malfunction" which, Lull argues, means a malfunction in the internal workings of a mechanical product. Lull contends that the overturning of the loader was not a mechanical malfunction and that, therefore, the principle has no application, at least to the asserted design defect. However, Lull does not offer, and there does not appear, any rational basis for this distinction, and, in any event, the loader's stability (or lack of it) is obviously a question of "mechanics." It is a reasonable conclusion that a vehicle that tips over during normal use without an external cause has malfunctioned in the grossest sense. *See* Greco v. Bucciconi Engineering Co., *supra*, 407 F.2d at 90, n. 4; Colosimo v. May Department Store Company, *supra*.

Lull next contends that plaintiff failed to prove that the loader was unreasonably dangerous for its intended use as required by Section 402A because, when the accident occurred, the loader was being operated with defective brakes and steering and such operation was not an intended use of the machine. The answer to this contention is, again, that the evidence tends to prove that whatever the condition of the brakes and steering, the jury could reasonably have found that the loader had performed no maneuvers beyond the range of those normally expected of this machine. Conceivably the loader might have moved more slowly or turned less sharply had the brakes and steering performed perfectly. But so long as the movements that did occur were within the normal range, the jury was justified in conclud-

ing that the loader was being used for its intended use when the accident occurred.

Moreover, while not necessary to the present decision, it should be noted that minor errors in operation or maintenance would not inevitably violate the concept of "normal use." *See* Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969); Dorsey v. Yoder Co., *supra*, 331 F.Supp. at 761–763.

Lull next argues that even if the loader was defective, plaintiff failed to prove that Lull breached the duty set forth in Section 388 of the Restatement (Second) of Torts ["CHATTEL known to be Dangerous for Intended Use"] to warn users of the loader's dangers. It is apparent that this argument is based on the assumption that the concept of "duty to warn" sometimes used in analyzing whether a product is unreasonably dangerous under Section 402A of the Restatement (Second) is based on Section 388.

In a defective design case where liability under Section 402A is asserted, the essence of plaintiff's claim normally is that the product possessed some inherent unreasonable dangers. If inherent danger is shown, the issue becomes whether the danger was unreasonable, taking into account the expertise of those reasonably expected to use it and the accompanying instructions or warnings. This issue may be posed in terms of asking whether the manufacturer has fulfilled its duty to warn of dangers which the manufacturer should know about and should reasonably expect the user not to know about. Canifax v. Hercules Powder Co., 237 Cal.App.2d 44, 46 Cal.Rptr. 552, 557–558 (1969); Dunham v. Vaughan and Bushnell Mfg. Co., 86 Ill.App.2d 315, 229 N.E.2d 684 (1967). Restatement (Second) of Torts, § 402A, comment j (1965). Section 388, on the other hand, while also setting forth a "duty to warn," applies broadly to any supplier of any chattel (see comment c) and, at least arguably, requires plaintiff to prove more than Section 402A requires. Section 388 requires a plaintiff to prove that the supplier knew or had reason to know of the chattel's dangers. This may be read to require a stronger affirmative showing of knowledge than Section 402A, which requires only proof that the manufacturer reasonably should have known.

Lull's arguments, however, fairly raise the issue of whether, whatever the dangerous characteristics of the loader may have been, Lull's program to inform users how properly to operate the loader, coupled with the users' own expertise, rendered the loader not unreasonably dangerous as a matter of law. Lull suggests that the loader's operating manual and Lull's program in which its dealers (e. g., Ransome) would train the operators of the machines they sold, together with the high degree of expertise possessed by the operating engineers who operated its machines, compel the conclusion that the loader was not unreasonably dangerous. The difficulty with this argument is, first, that the evidence clearly shows that the only specific information that Lull provided to anyone concerning the dangers alleged to be involved in this case, i. e., the loader's lateral stability, was the statement in the Lull manual, "Do not travel more than a few feet with the lift arms fully raised." (N.T. 477, 474–76) Second, the record is devoid of evidence that operating engineers such as Anthony Recchia were aware that the loader should not have been operated as it was operated in this instance, or that operating engineers were aware of the dangers involved in moving the loader while the boom was halfway extended. (N.T. 501–24.) It is significant that the operating engineers who testified were not questioned on these points.

Lull's final contention in support of its motion for judgment n. o. v. is that plaintiff failed to prove causation. Lull makes three arguments: (1) that, assuming a defect in design, the defect was a "mere circumstance" in the happening of the accident and the bad brakes and steering were the proximate cause (Lull Brief at 40); (2) that the alleged design defect was not a proxi-

mate cause, since it was not foreseeable that the vehicle would be operated with bad brakes and steering, or that a qualified distributor would advise the continued use of the vehicle under the circumstances of this case; and (3) that there was no proof that "failure to give more data was a proximate cause of the accident." (Lull Brief at 42.)

▮ Lull's first argument, that the design defect was only a circumstance of the accident, adopts the view that the design defect contributed only passively to the accident. Lull points out that the loader had been operated for six months before the accident without turning over, and that plaintiff's experts testified that bad brakes and steering were the "real cause." It should be obvious that in many design defect cases the latent defect will remain latent until some active agent interacts with the defect to bring about the harm. In the sense of being passive, therefore, a design defect is frequently a circumstance of an accident. Whether that characterization is appropriate in the present case is fairly debatable. The top-heaviness of the loader can be regarded as having been a direct and active cause of decedent's death.

▮ Be that as it may, the fact that a defect operates passively does not necessarily make it any less a substantial factor. In the present case, the defect remained latent for six months until it interacted with the particular terrain and maneuvers that made it patent. A jury could reasonably have found on this evidence that the loader was unreasonably unstable and that this defect was a substantial factor in bringing about the accident, without having to conclude that it would turn over every time it was operated.

Lull's assertion that plaintiff's experts testified that bad brakes and steering were the "real cause" of the accident is simply not so, and, in any event, the jury could reasonably have concluded that the design defect was a legal cause of the accident from other evidence in the case,

i. e., the testimony relating to the movements of the loader before the accident, the terrain, and the general description of the loader's purpose and manner of use.

▮ Lull's second argument concerning the unforeseeability of defective brakes and steering and Ransome's conduct is answered in various ways. First, whatever the foreseeability of the bad brakes and steering, Ransome's conduct and Anthony Recchia's operation of the machine, the jury could reasonably have found that the movements of the loader that did in fact occur were not unforeseeable in that they were not beyond the range of those movements normally expected of this machine. Second, under the principles relating to causation set forth in the Restatement (Second) of Torts (§§ 430–462) which have been or would likely be adopted as law in Pennsylvania, Whitner v. Lojeski, 437 Pa. 448, 458, 461, 263 A.2d 889 (1970), it appears that where the actor's conduct increases the risk of some particular harm the fact that the harm is ultimately brought about only by the intervention of another force does not relieve the actor from liability. Restatement (Second) of Torts, § 442B (1969). Finally, none of the factors to which Lull refers could be considered unforeseeable as a matter of law. *See, e. g.,* Dyson v. General Motors Corp., *supra*; Dorsey v. Yoder Co., *supra*, 331 F.Supp. at 764.

▮ Lull's final argument concerning causation is that there was no proof that Lull's failure to provide more information, in its operating manual or otherwise, was a proximate cause of the accident. The issue of the adequacy of warnings or instructions was, in this case, unrelated to the issue of causation, but rather involved the issue of whether the loader was unreasonably dangerous. Once the jury found that the loader, taken with the warnings and instructions that accompanied it, was unreasonably dangerous, the only causation issue for them to resolve was whether the danger they found was a substantial factor in bringing about the accident. Accord-

ingly, whether or not plaintiff proved that inadequate warnings or instructions caused the accident is not controlling. Jacobs v. Technical Chemical Co., Tex. Civ.App., 472 S.W.2d 191 (1971); see, Dunham v. Vaughan and Bushnell Mfg. Co., supra; Canifax v. Hercules Powder Co., supra.

Lull's motion for judgment n. o. v. will be denied.

### Lull's Motion for a New Trial

Lull raises numerous issues in support of its motion for a new trial. They will be discussed seriatim.

■ Lull contends plaintiff's experts were all unqualified to testify concerning the design of the loader because none of them had any experience with the design of construction machinery, particularly high-lift loaders. Plaintiff offered the testimony of three experts: Ballantine, Grosvenor and Baccini. Since Ballantine did not testify concerning the stability of the loader, this objection to his testimony is without merit. Grosvenor and Baccini testified about the design of the machine. Grosvenor was for many years professor of mechanical engineering and professor of metallurgical engineering at Drexel University. (N.T. 236–36.) Baccini had a degree in mechanical engineering, was a registered professional engineer and had experience with the design features of industrial lifting equipment. (N.T. 347–48, 351–52.) Both witnesses had competence beyond that of the lay person to testify concerning a basic mechanical characteristic of the machine, and its stability under various conditions. Griffith v. Clearfield Truck Rentals, Inc., supra, 427 Pa. at 41, 233 A.2d 896; Moodie v. Westinghouse Electric Corp., 367 Pa. 493, 80 A.2d 734 (1951). See generally, II Wigmore, Evidence 3rd ed. § 557 (1940).

■ The next ground that Lull advances is that the testimony of Grosvenor and Baccini was so indefinite on the issue of whether a design defect caused the accident that it should not have been admitted. The essence of the testimony of these two witnesses on the issue was that, given the circumstances of the accident testified to by other witnesses and stated in several hypothetical questions (N.T. 251–52, 363), the loader would not have turned over had it been designed to be more stable. (N.T. 253–57, 364, 367, 370.) This conclusion merely confirmed what any intelligent layman would have concluded, i. e., that, in the final analysis, the stability of a machine is a matter of design. This testimony was obviously nothing like the speculation upon speculation found in Moyer v. Ford Motor Co., 205 Pa.Super. 384, 209 A.2d 43 (1965), cited by Lull.

Lull next contends that Grosvenor's and Baccini's testimony on the design-stability issue was not supported by the facts of record. Lull argues that the experts improperly proceeded from the (obvious) conclusion that the machine turned over because it was unstable by design under the conditions immediately preceding the accident to the conclusion that the loader was "unsafe." That the machine was "unsafe" Lull asserts was a conclusion not supported by the facts and, in addition, an ultimate issue in the case to which the experts should not have been permitted to testify.

■ There was ample evidence on which experts could base testimony that the loader was unsafe. Much of the testimony in the case related the function and purpose of the machine, how and for what it had been used, and the conditions at this site and at other construction sites. These experts, both of whom were familiar with construction equipment in general, the conditions encountered at construction sites, and the demands generally made of construction equipment at such sites, were clearly capable of taking the facts adduced up to that point and stating whether or not it would be reasonable to expect a piece of construction equipment such as the loader to fall over.

■ As to whether this testimony was improper because it invaded

the province of the jury, Lull is quite correct as evidenced by its ample citation of authority that the trial court may properly exclude expert testimony on the ultimate issue in a case. Of course, this does not mean it must always do so. In the present case, the jury was entitled to have the opinion of experts on what performance could reasonably be expected from this piece of construction machinery. An expert conclusion that the machine would not reasonably be expected to turn over in the circumstances of this accident would be tantamount to at least a preliminary conclusion that the loader was "unsafe." The two issues were so closely and obviously linked that, in the context of this case, it was appropriate to permit the testimony to be given simply and clearly in a form the jury could understand and evaluate for whatever it was worth.

■■■ Lull's next ground for a new trial is that the court improperly excluded evidence (N.T. 455–57) that other manufacturers of high-lift loaders operated through distributors just as Lull did. It is asserted that this evidence would have tended to show that Lull acted reasonably in expecting its distributors to furnish instructions and warnings to its loaders' operators. The evidence was properly excluded as irrelevant, since the issues relating to Lull's instructions and warnings basically involved whether or not Lull gave anyone any information, instructions or warnings concerning the loader's stability and, not to whether it was reasonable to use a distributor to instruct operators of its machine. In any event, it is doubtful that the exclusion of this evidence had much effect on the jury's knowledge on the subject, since evidence that other construction equipment manufacturers utilized distributors was admitted through the testimony of several other witnesses. (E. g., N.T. 112, 726–27, 731, 771.)

Lull next asserts it was error to exclude the testimony of O. W. Nord to the effect that a loader that would not overturn in its tightest turn at maximum speed could not be built. (N.T. 555.) This testimony was intended to refute the testimony of plaintiff's expert Grosvenor that such a vehicle would be considered safe. (N.T. 331–33, 335–36.) In fact, Nord's testimony was excluded only on a question relating to how a loader with such characteristics might be constructed. Nord was permitted to testify that no such machine had ever been built or designed. (N.T. 556.) Grosvenor's testimony did not suggest that such performance characteristics would be required for safe operation. (N.T. 331–33, 335–37.)

■■■ Lull next asserts that a new trial is required because the court excluded motion pictures showing the operation of a 32-foot high lift loader similar to the 40-foot loader involved in the accident. The jury had already observed films of the operation of the loader involved in the accident, and much of the testimony in the case related to the description, use and operation of high lift loaders. Undoubtedly, the jury had an adequate understanding of the operation of the loader. Since the offered films pictured a materially different machine, there was risk of confusing the jury. These films were properly excluded.

■■■ Next Lull asserts that plaintiff's experts should not have been permitted to answer hypothetical questions that assumed the testimony of witnesses as facts. Such hypothetical questions are generally proper where the testimony of specific witnesses is asked to be assumed and the court determines that the question will be intelligible to the jury. II Wigmore, Evidence § 681 at n. 7. Tobash v. Jones, 419 Pa. 205, 212, 213 A.2d 588 (1965); Bowles v. Pittsburgh, 343 Pa. 39, 46, 20 A.2d 783 (1941). These standards were met here.

Lull next contends that the court erred in failing to include in its charge a standard by which they might determine both whether the vehicle was "unreasonably dangerous for its intended use" and whether Lull negligently designed the loader. Lull argues that it was es-

sential to the court to call the jury's attention to all the factors the jury might consider in resolving the two above-stated ultimate issues. Lull argues, for example, that the court should have charged the jury that it should consider whether other loaders were any safer than Lull's.

■ The "standards" to which Lull refers are relevant considerations and may form the basis of valid and persuasive arguments on the ultimate issues, but no one or group of them is in itself determinative. In the present case, all counsel had ample opportunity to and, in fact, did, argue to the jury the factors which they wanted the jury to consider in resolving the ultimate issue. It would have been both unnecessary and inappropriate for the court to restate to the jury the arguments of counsel except where clarification of some subsidiary issue or argument appeared necessary. (E. g., N.T. 836, 865.) The charge did adequately cover this issue.

■ Lull next contends that the court erred in instructing the jury to disregard the issue of the presence or absence of ballast in the loader's wheels. This argument is most surprising, since Lull's counsel, after being asked by the court whether such an instruction should be given, replied that it would be "a wise thing to do." (N.T. 877.) Be that as it may, the evidence on this subject was insufficient to justify submission to the jury.

Lull's final ground for a new trial is that "the court refused to charge as requested by Lull in Requests Nos. 7, 8, 10, 14, 15, 17 and 24." The substance of points 8, 10, 15 and 17 was discussed in the charge. (See N.T. 833–34; 836–37; 885; 833–34; 833–35, 838–39; respectively.) The part of point 7 which did not constitute argument was generally covered in the charge. The part of point 24 which would not have removed a factual issue from the jury was also discussed. (N.T. 835–37.) Point 14 was properly rejected.

Lull is not entitled to a new trial on plaintiff's claims.

*Lull v. Ransome—Ransome v. Lull*

■ Lull argues that if the verdict is sustained, then it is entitled to indemnity from Ransome on the ground that Ransome's conduct was the active primary contributing factor in the accident while Lull's conduct was passive and only a secondary factor. The leading case on this issue, Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368 (1951), cited by Lull, does not support Lull's contention. The court in *Builders Supply* pointed out that a right of indemnity accrues to a party when the law imposes liability on it, not for its own act, but for another's act. *Builders Supply* unequivocally held that where there are two concurrent or joint tortfeasors each of whose liability arose out of its own acts, there is to be no consideration of their relative fault but rather joint and several liability is to be imposed upon both. *Builders Supply* at 328, 77 A.2d 368. *Cf.* Burbage v. Boiler Engineering & Supply Co., 433 Pa. 319, 249 A.2d 563 (1969); Tromza v. Tecumseh Products Co., 378 F.2d 601 (3d Cir. 1967).

Ransome alleges that two Lull witnesses falsely testified that a "stop" existed in the brake wheel cylinders, with the result that the jury found adversely to Ransome on the issue of defective brakes. Ransome contends that it is entitled to a new trial against Lull on this issue and that it should be permitted to amend its cross-claim against Lull to allege fraud on the court by Lull, and to amend its prayer to include any sums Ransome is required to pay plaintiff, plus expenses.

Ransome's position about the significance of the testimony appears to be as follows: Assuming that a jury could reasonably have found from plaintiff's evidence that the brakes were less effective in reverse than forward, this finding would tend to support plaintiff's theory of the accident because the accident occurred while the machine was being operated in reverse. The testimony of two

Lull expert witnesses was that the difference in braking effectiveness could be accounted for if the rear brakes had been less well adjusted than the front brakes. This explanation would lend support to the contention that there was a difference between braking in forward and braking in reverse and would tend to support a finding that Ransome was responsible for the defective condition because it did not adjust the brakes. On cross-examination Ransome challenged this testimony as being based on the erroneous assumption that maladjustment of the brakes could result in the brake cylinder being so far away from the brake lining that the brake shoe would not fully contact the lining when the brakes were applied. (N.T. 588–92, 679–86a.) This was said to be possible because the travel of the piston was limited (N.T. 589, 680), according to one of the witnesses, by a snap ring in a retaining groove. (N.T. 681.) If the jury had been aware that there was no such stop, it would not have found that the brakes were defective or at least would not have held Ransome responsible for any defects.

Ransome now asserts that it can prove that, in fact, there was no stop that would limit the travel of the piston, and in support of its position it has filed a formal request that Lull admit that there was no stop. Its motion to compel Lull to answer the request for admissions includes an affidavit of an expert on brakes to the effect that there is no stop to limit the travel of the piston, and a diagram and parts list which Ransome asserts reveals the absence of a stop.

■ It is clear that this Court may, in a proper case, grant a new trial because of fraud on the Court, misconduct of a party, or newly discovered evidence, or whenever justice requires such relief. Fed.R.Civ.P. 59(a), 60(b); 6A Moore, Federal Practice, ¶ 59.08 [2] nn. 27–31 (1966); 7 Moore, Federal Practice, ¶ 60.24, 60.36 (1970). Whether such relief is proper is a matter addressed to the discretion of the Court exercised under Rule 59 and equitable principles. Among the factors that may be considered are whether Ransome was actually prejudiced and, if so, whether Ransome could have done anything at trial to avoid such prejudice.

At the outset, it should be noted that, for reasons that need not be detailed here, it does not appear that the affidavit and diagram contained in Ransome's discovery motion are necessarily inconsistent with the essence of the testimony of Lull's witnesses. It will be assumed for present purposes, however, that Ransome could prove the trial testimony was in error if given the opportunity to do so.

Turning first to the issue of prejudice, it appears very questionable that the testimony about which Ransome complains affected the outcome of the case. For example, if it is assumed that, in holding Ransome liable for defective brakes, the jury must have concluded that the braking was worse in reverse than in forward, there were other theories that would support such a finding. The jury might have found, for example, that the rear brake linings were more badly glazed than the front linings. In addition, of course, Ransome does not assert that the allegedly false testimony had anything to do with its being found responsible for the loader's defective steering.

■ But the dispositive consideration in the present case relates to Ransome's response to this evidence at trial. This action was filed in 1966, and was the subject of extensive discovery on all sides. Ransome knew well in advance of trial that the condition of the brakes would be an issue of significance. Ransome was in the business of selling and servicing high-lift loaders, and must have had ample knowledge about the construction and adjustment of the brakes involved in this case. Ransome's cross-examination of the Lull witnesses and its production the next day of a witness who testified that there was no stop (N.T. 739, 747) indicates it was fully aware of the significance of the

Lull testimony. The Lull witnesses testified on Monday. Ransome's case began the next day and ended on Wednesday. If the issue of the existence of the stop were as clear-cut as Ransome asserts, it had ample opportunity to marshall the evidence to set the record straight. No continuance was sought, and the court was thus deprived of the opportunity to dispose of the issue at trial. Larrison v. United States, 24 F.2d 82, 87–88 (7th Cir. 1928); 6A Moore, Federal Practice ¶ 59.08 [3] at nn. 13–15, 23; *see, e. g.,* Plisco v. Union R. R., 379 F.2d 15 (3d Cir. 1967); Kender v. General Expressways, Ltd., 34 F.R.D. 237 (E.D.Pa. 1967); Lewis v. Kepple, 185 F.Supp. 884, 888 (W.D.Pa.1960), aff'd 287 F.2d 409 (3d Cir. 1961). There is no valid reason to permit Ransome to relitigate this issue.